# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------x

United Payment Services, Inc.,

                           Plaintiff,

  -against-

                                    **VERIFIED COMPLAINT**

Direct Connect Merchant Services, LLC,

                           Defendant.

-------------------------------------x

      Plaintiff, complaining of the defendant, by its attorneys The Law Offices of Louis Venezia, P.C., respectfully shows to this Court and alleges, upon information and belief, the following:

### AS AND FOR A FIRST CAUSE OF ACTION

      1:   That at all times hereinafter mentioned, the plaintiff was, and still is, a foreign corporation duly organized and existing pursuant to the laws of the State of California having its principal place of business located in Oak Park, California.

      2:   That at all times hereinafter mentioned, the defendant was, and still is, a foreign limited liability company duly organized and existing pursuant to the laws of the State of Florida, having its principal place of business located in Chantilly, Virginia.

      3:   Pursuant to the terms of the contract described below, the parties have designated the County of New York, State of New

INDEX NO. 651022/2018
RECEIVED NYSCEF: 03/04/2018

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 3 of 104

York as the proper venue for the resolution of disputes between them, each party having consented to the jurisdiction of the courts of the State of New York.

4: On or about January 6, 2017 the parties entered into a written contract for the sale of a business owned by the plaintiff (Exhibit A - hereinafter "the contract").

5: The contract specifies a first payment to be made at the time of the closing (Exhibit A, page 5, under the definition "Closing Payment" and page 19, Section 3.1) and said payment was made.

6: The plaintiff performed its obligations pursuant to the terms of said contract.

7: The contract specifies a second payment to be made upon the defendant achieving a certain level of monthly revenue "...in respect of the merchant accounts comprising the Seller Residual Portfolio for the month ending December 31, 2017" (Exhibit A, page 20, Section 3.2.[b][i]).

8: The defendant achieved the level of monthly revenue which required it to make the second payment to the plaintiff.

9: The contract specifies that the defendant was required to make a second payment "within sixty (60) days following the end of the relevant measurement period." (Exhibit A, page 20, Section 3.2.[b][iii]), to wit, March 1, 2018.

10: The required second payment was not made by the defendant, although duly demanded.

11: In correspondence by email and postal letter, the defendant attempted to rewrite the contract by claiming that the plaintiff was required to meet other conditions outside the terms of the contract in order to qualify for the second payment.

12: The defendant's proffered reasons for not performing under the terms of the contract are baseless and a pretext for retaining the amount of the second payment.

13: The contract does not contain the conditions that the defendant claimed were required in order for plaintiff to qualify for receipt of the second payment which demonstrates that the defendant's breach of the terms of the contract was willful.

14: By its actions, the defendant breached the implied covenant of good faith and fair dealing.

15: That solely by reason of the foregoing, damage has been caused to the Plaintiff in the sum of $550,000 plus interest from March 1, 2018 at the statutory rate and consequential damages.

## AS AND FOR A SECOND CAUSE OF ACTION

16: Each and every allegation of the within complaint is repeated and realleged as if more fully set forth herein at length.

17: Due to the breach of the contract terms by the defendant, the plaintiff is entitled to recover its attorneys fees and litigation expenses (Exhibit A, page 51, Section 10.1 [b][ii]).

18:  That solely by reason of the foregoing, the plaintiff has been damaged in a sum to be calculated by the court at the conclusion of the matter plus interest at the statutory rate.

**WHEREFORE**, plaintiff demands judgment against the defendant on the first cause of action in the sum of $550,000.00 plus interest from March 1, 2018 at the statutory rate and consequential damages; plaintiff further demands judgment for its expenses, costs and attorneys fees relating to each cause of action; and for such other and further relief as this Court may deem just and proper.

Dated: Queens, New York
       March 3, 2018

                              YOURS, ETC.,

                              Law Office of Louis Venezia, P.C.

                              BY: _____
                                    Louis Venezia, Esq.
                              Attorneys for the Plaintiff
                              110-20 71st Road, Suite 611
                              Forest Hills, New York 11375
                              718-268-5345

## VERIFICATION

LOUIS VENEZIA, an attorney duly admitted to practice law before the Courts of the State of New York, hereby affirms the following to be true pursuant to CPLR §2106 and under the penalty of perjury:

Affirmant is the attorney for the plaintiff. Affirmant has read the foregoing VERIFIED COMPLAINT and knows the contents thereof. The same is true to Affirmant's own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters Affirmant believes them to be true. Affirmant further says that the source of Affirmant's information and the grounds of Affirmant's belief as to all the matters herein not stated upon Affirmant's knowledge are: communications had with the plaintiff, file documents, reports of investigation caused to be made by the plaintiff and other pertinent data relating thereto. Affirmant further says that the reason why this verification is made by Affirmant and not by the plaintiff is that plaintiff does not reside within the County of Queens, the County wherein Affirmant maintains his office.

Dated:   Queens, New York
         March 3, 2018

                                            LOUIS VENEZIA

# EXHIBIT  A

**ASSET PURCHASE AGREEMENT**

**by and among**

**UNITED PAYMENT SERVICES, INC.,**

**SCOTT ROSEN AND CRAIG ROSEN**

**AND**

**DIRECT CONNECT MERCHANT SERVICES, LLC**

**Dated as of January 6, 2017**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................4
  Section 1.1.     Definitions..................................................... 4

ARTICLE II PURCHASE AND SALE ..................................................15
  Section 2.1.     Agreement to Purchase and Sell. .................................. 15
  Section 2.2.     Assets. ............................................................ 15
  Section 2.3.     Excluded Assets. ................................................. 16
  Section 2.4.     Assumed Liabilities. ............................................. 17
  Section 2.5.     Excluded Liabilities. ............................................ 18

ARTICLE III PURCHASE PRICE; ADJUSTMENTS; ALLOCATIONS...................19
  Section 3.1.     Purchase Price. ................................................... 19
  Section 3.2.     Payment of Purchase Price........................................ 19
  Section 3.3.     Allocation of Purchase Price...................................... 21

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER ......................21
  Section 4.1.     Organization; Capitalization; Subsidiaries. ...................... 21
  Section 4.2.     Authorization. ................................................... 22
  Section 4.3.     Absence of Restrictions and Conflicts. ........................... 22
  Section 4.4.     Real Property. ................................................... 23
  Section 4.5.     Title to Assets; Related Matters.................................. 23
  Section 4.6.     Financial Statements. ............................................ 24
  Section 4.7.     No Undisclosed Liabilities. ...................................... 24
  Section 4.8.     Absence of Certain Changes. ...................................... 24
  Section 4.9.     Legal Proceedings................................................. 26
  Section 4.10.    Compliance with Laws. ............................................ 26
  Section 4.11.    Contracts. ....................................................... 26
  Section 4.12.    Insurance Policies. .............................................. 28
  Section 4.13.    Environmental, Health and Safety Matters.......................... 29
  Section 4.14.    Intellectual Property............................................. 29
  Section 4.15.    Transactions with Affiliates...................................... 30
  Section 4.16.    Undisclosed Payments. ............................................ 31
  Section 4.17.    Employees; Consultants; Labor Matters; Company Benefit Plans.......... 31
  Section 4.18.    Permits. ......................................................... 34
  Section 4.19.    Brokers, Finders and Investment Bankers. ......................... 34
  Section 4.20.    Taxes............................................................. 34
  Section 4.21.    Compliance with Associations, Service Providers and Program Standards.
                   .................................................................. 35
  Section 4.22.    Consumer Privacy.................................................. 36
  Section 4.23.    Underwriting Guidelines: Merchant Accounts ....................... 38
  Section 4.24.    No Termination/Deregistration..................................... 38

| Section 4.25. | Disclosure and Cancellation of Service Provider; Association, Merchant and Referral Source Contracts. | 38 |

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE MANAGEMENT TEAM MEMBERS** ..... 39

| Section 5.1. | Authorization. | 39 |
| Section 5.2. | Absence of Restrictions and Conflicts. | 39 |
| Section 5.3. | Legal Proceedings. | 40 |
| Section 5.4. | No Brokers. | 40 |

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ..... 40

| Section 6.1. | Organization. | 40 |
| Section 6.2. | Authorization. | 40 |
| Section 6.3. | Absence of Restrictions and Conflicts. | 41 |
| Section 6.4. | Brokers, Finders and Investment Bankers. | 41 |

**ARTICLE VII CERTAIN COVENANTS AND AGREEMENTS** ..... 41

| Section 7.1. | Public Announcements. | 41 |
| Section 7.2. | Consents. | 41 |
| Section 7.3. | Non-Competition; Non-Solicitation. | 42 |
| Section 7.4. | Collection of Accounts. | 44 |
| Section 7.5. | After-Acquired Assets. | 44 |
| Section 7.6. | Change in Name. | 44 |
| Section 7.7. | No Voluntary Dissolution; Preservation of Records. | 44 |
| Section 7.8. | Employees. | 45 |
| Section 7.9. | Confidentiality. | 46 |

**ARTICLE VIII TAX MATTERS** ..... 47

| Section 8.1. | Tax Cooperation | 47 |
| Section 8.2. | Transfer Taxes. | 48 |
| Section 8.3. | Apportionment of Taxes. | 48 |
| Section 8.4. | Tax Claims. | 48 |

**ARTICLE IX CLOSING** ..... 49

| Section 9.1. | Closing. | 49 |
| Section 9.2. | Deliveries by the Seller. | 49 |
| Section 9.3. | Deliveries by the Purchaser. | 50 |

**ARTICLE X INDEMNIFICATION** ..... 50

| Section 10.1. | Indemnification Generally. | 50 |
| Section 10.2. | Indemnity Cap for the Seller Indemnified Parties. | 51 |
| Section 10.3. | Assertion of Claims; Payment of Claims; Right of Setoff. | 51 |
| Section 10.4. | Survival of Representations and Warranties. | 52 |
| Section 10.5. | Effect of Investigation. | 52 |
| Section 10.6. | Purchase Price Adjustment. | 52 |

- 2 -

ARTICLE XI MISCELLANEOUS PROVISIONS .................................................................52

    Section 11.1.    Remedies. ................................................................. 52
    Section 11.2.    Notices. ................................................................... 53
    Section 11.3.    Schedules and Exhibits. ........................................ 54
    Section 11.4.    Assignment; Successors in Interest. ..................... 54
    Section 11.5.    Number; Gender. .................................................. 54
    Section 11.6.    Captions. ............................................................... 54
    Section 11.7.    Controlling Law. ................................................... 54
    Section 11.8.    Consent to Jurisdiction, Etc. ................................ 54
    Section 11.9.    WAIVER OF JURY TRIAL. ................................ 55
    Section 11.10.    Severability. ......................................................... 55
    Section 11.11.    Counterparts and Electronic Delivery. ................. 55
    Section 11.12.    Enforcement of Certain Rights. ............................ 55
    Section 11.13.    Amendment/Waiver. ............................................ 56
    Section 11.14.    Integration. ........................................................... 56
    Section 11.15.    Cooperation Following the Closing. ..................... 56
    Section 11.16.    Transaction Costs. ................................................ 56
    Section 11.17.    Interpretation; Construction. ................................. 56

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of January 6, 2017, is made and entered into by and among United Payment Services, Inc. (the "Seller"), Scott Rosen and Craig Rosen, each a stockholder of the Seller (each, a "Stockholder") and Direct Connect Merchant Services, LLC, a Florida limited liability company (the "Purchaser").

A.     The parties desire to enter into this Agreement pursuant to which the Seller proposes to sell to the Purchaser and the Purchaser proposes to purchase from the Seller, substantially all of the assets used or held for use by the Seller in the conduct of the Business as a going concern.

B.     The Stockholders own all of the Equity Interests of the Seller.

C.     The parties desire to make certain representations, warranties and agreements in connection with the transactions contemplated hereby.

**NOW, THEREFORE,** in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1.     Definitions.**

(a)     The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, (a) a director, officer, partner, member, beneficiary or stockholder of such Person; (b) a spouse, parent, sibling or child of such Person (or spouse, parent, sibling or child of any director or executive officer of such Person); and (c) any other Person that, directly or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person.

"Agreement" has the meaning set forth in the introductory paragraph hereto.

"Assets" has the meaning set forth in Section 2.1.

"Assignment and Assumption Agreement" has the meaning set forth in Section 9.2(d).

"Association" means Visa, MasterCard, American Express Travel Related Services, Inc. and DFS Services, LLC.

"Association Requirement" means an effective bylaw, regulation or other requirement of, and made publicly available by an Association or any other association, network or organization that issues or authorizes the issuance of a bank card.

- 4 -

"Assumed Contracts" has the meaning set forth in Section 2.2(c).

"Assumed Liabilities" has the meaning set forth in Section 2.4(b).

"Bank Secrecy Act" means the Bank Secrecy Act of 1970, as such may be amended from time to time.

"Bill of Sale" has the meaning set forth in Section 9.2(c).

"Books and Records" has the meaning set forth in Section 2.2(j).

"Business" means the Seller's business of providing the following payment and merchant acquisition services to businesses across the United States: credit, debit, ACH, gift and loyalty card, remote deposit capture, PIN debit, ATM, fleet, EBT, check authorization and conversion, as well as point-of-sale software, terminals and machines, e-commerce and wireless payment processing solutions, mobile payments, merchant cash advance, ATM management and financing for point-of-sale products.

"Business Day" means any day except Saturday, Sunday or any day on which banks are generally not open for business in the City of New York.

"Cap Amount" has the meaning set forth in Section 10.2.

"Cash" means the Seller's cash and short-term investments that are easily and readily convertible to cash, such as U.S. government Treasury bills, bank certificates of deposit, bankers' acceptances, corporate commercial paper and other money market instruments, as determined in an accordance with GAAP.  For the avoidance of doubt, outstanding checks payable will reduce Cash.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any rules or regulations promulgated thereunder.

"CISP" has the meaning set forth in Section 4.22(b).

"Closing" has the meaning set forth in Section 9.1.

"Closing Date" has the meaning set forth in Section 9.1.

"Closing Payment" means $4,745,000.

"COBRA" means the provisions for the continuation of health care enacted by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and as codified in Section 4980B of the Code and Section 701 *et. seq.* of ERISA, and the rules and regulations promulgated under the applicable provisions of the Code and ERISA.

"Code" means the Internal Revenue Code of 1986, as amended.

- 5 -

"Company Benefit Plan" means each employee benefit plan, as defined in Section 3(3) of ERISA, each employment, severance or similar contract and each other agreement, plan, policy or arrangement (whether written or oral) providing for compensation, bonuses, commission, profit-sharing, partnership interest, stock option or other equity-related rights or other forms of incentive or deferred compensation (including any such plans governed by Section 409A of the Code), vacation and other paid time off benefits, insurance, health or medical benefits, employee assistance program, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, severance benefits, post-employment, retirement or pension benefits and other employee benefit arrangements, plans, policies or practices maintained, sponsored or contributed to by the Seller or for which the Seller has any Liability, contingent or otherwise.

"Confidential Information" means any non-public information concerning the businesses and affairs of any party.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of October 20, 2016 by and between the Seller and the Purchaser.

"Continuation Period" has the meaning set forth in Section 7.7(a).

"Contract" means any written or oral contract, agreement, commitment, Permit, loan or credit agreement, note, bond, mortgage, indenture, lease, sublease, purchase order or other agreement, instrument, concession, franchise or license, including, without limitation, employment agreements, independent contractor or consulting agreements, staffing company contracts, customer contracts and customer orders.

"Control" means (including, with correlative meanings, "controlled by" and "under common control with"), with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Copyrights" has the meaning set forth in the definition of Intellectual Property Right.

"Customer Information" means all non-public records, books, reports, data and other information concerning customers of the Seller in the possession of the Seller.

"Employment Laws" has the meaning set forth in Section 4.17(d).

"Environmental Condition" means any noncompliance or alleged noncompliance with Environmental Laws, including any pollution or contamination of the soil or groundwater at, under or migrating from or onto the real property owned or leased by the Seller, related to the Business or the Assets that occurred prior to or is continuing as of the Closing Date.

"Environmental Laws" means any federal, state, local or foreign Law, treaty, judicial decision, regulation, Permit or governmental restriction or any agreement with

any Governmental Entity or other third party, whether now or hereafter in effect, relating to the environment, or human or worker health and safety in connection with environmental conditions, or to pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substances, wastes or materials.

"<u>Equity Interests</u>" means (i) with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether voting or nonvoting) of capital stock, including each class of common stock and preferred stock of such Person, and (ii) with respect to any Person that is not a corporation, any and all general partnership interests, limited partnership interests, membership or limited liability company interests, beneficial interests or other equity interests of or in such Person (including any common, preferred or other interest in the capital or profits of such Person, and whether or not having voting or similar rights).

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" means, with respect to the Seller, any other Person that is a member of a controlled group for purposes of Section 4001(a)(14) of ERISA or that is treated as a single employer for purposes of Section 414 of the Code.

"<u>Event Blockage</u>" has the meaning set forth in Section 3.2(b)(iv).

"<u>Excluded Assets</u>" has the meaning set forth in Section 2.3.

"<u>Excluded Contracts</u>" has the meaning set forth in Section 2.3(b).

"<u>Excluded Liabilities</u>" has the meaning set forth in Section 2.5.

"<u>Excluded Taxes</u>" means (i) any Liability (whether direct or as a result of transferee Liability, joint and several Liability, contractual Liability) of the Seller for Taxes (including all income Taxes incurred on, after, or before the Closing Date) (whether accrued or payable on, after, or before the Closing Date) and (ii) any Liability (whether direct or as a result of transferee Liability, joint and several Liability, contractual Liability) for Taxes for periods (or portions thereof) ending on the Closing Date (as determined under Section 8.3) that are related to the Assets or the Business (whether accrued or payable on, after, or before the Closing Date). For the avoidance of doubt, Transfer Taxes shall not be Excluded Taxes and shall be governed by Section 8.2.

"<u>FDMS</u>" means First Data Merchant Services Corporation.

"<u>FDMS Agreement</u>" means that certain Marketing Agreement between the Seller, First Data Merchant Services Corporation and Wells Fargo, dated as of October 1, 2011 pursuant to which Seller markets and solicits Merchants (as defined therein) to utilize the processing services of FDMS and Wells.

"<u>Financial Statements</u>" has the meaning set forth in Section 4.6.

- 7 -

"Future Residuals" means all residuals to which Seller is entitled under the FDMS Agreement.

"GAAP" means generally accepted accounting principles employed in the United States.

"Governmental Entity" means, the United States government, any state, local or foreign government or any court, department, instrumentality, commission, tribunal, agency, including administrative or regulatory agencies, of the United States government, any state government or any local government, or other governmental authority or agency, domestic or foreign, or any arbitrator.

"Hazardous Materials" mean any waste, pollutant, contaminant, hazardous substance, toxic, ignitable, reactive or corrosive substance, hazardous waste, special waste, industrial substance, by-product, process intermediate product or waste, petroleum or petroleum-derived substance or waste, chemical liquids or solids, liquid or gaseous products or any constituent of any such substance or waste, the use, handling or disposal of which by the Seller is in any way governed by or subject to any applicable Environmental Law.

"Indebtedness" means, (i) all indebtedness for borrowed money or for the deferred purchase price of property or services in respect of which the Seller is liable, contingently or otherwise, as obligor or otherwise (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), (ii) any other indebtedness that is evidenced by a note, bond, debenture, acceptance or similar instrument, or arising out of letters of credit or bankers' acceptances issued for the Seller's account, (iii) all obligations under financing leases, (iv) the net obligations for which the Seller is obligated pursuant to any hedging agreement or arrangement, (v) all obligations, contingent or otherwise, of Seller that, in accordance with GAAP, should be classified upon the balance sheet of the Seller (or notes thereto) as indebtedness, (vi) all obligations of the Seller arising in connection with any acquisition of assets or businesses to the seller of such assets or businesses and the payment of which is dependent on the future earnings or performance of such assets or businesses and contained in the agreement relating to such acquisition or in an employment agreement delivered in connection therewith, (vii) all liabilities secured by any lien on any property of the Seller and (viii) all indebtedness of others referred to in clauses (i) through (vii) guaranteed directly or indirectly by the Seller or which the Seller has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a credit against loss and (ix) interest, principal, prepayment penalty, fees, or expenses, to the extent due or owing in respect of those items listed in clauses (i) through (viii) above, whether resulting from their payment or discharge or otherwise.

"Indemnified Persons" means the Purchaser Indemnified Parties or the Seller Indemnified Parties, as the case may be, that is entitled to be indemnified under Article X.

- 8 -

"Indemnifying Persons" means the Purchaser or the Seller, as the case may be, that is required to provide indemnification under Article X.

"Intellectual Property" has the meaning set forth in Section 4.14(a).

"Intellectual Property Right" means all domestic and foreign (i) trademarks, service marks, certification marks, trade names, trade dress, fictitious business names (d/b/a's), telephone numbers, commercial symbols, logos, and slogans, internet domains and URLs, registered user names, social media accounts, pages, registered user names and passwords, applications and registrations for any of the foregoing, renewals and extensions thereof, and all goodwill associated with any of the foregoing (collectively, "Marks"), (ii) patents, utility models, industrial design registrations and applications for any of the foregoing, including all provisionals, divisionals, continuations, continuations-in-part, extensions, substitutions, renewals, reexaminations, reissues, additions, any supplementary certificates of protection of or to any of the foregoing, and any registrations or applications for registration of any of the foregoing (collectively, "Patents"), (iii) copyrights, mask works and any works of authorship, including literary works and all forms of Software (whether in source code, object code, firmware, development tools, files, records, or data), databases, marketing materials, advertising, all documentation related to any of the foregoing, any registrations or applications for registration of any of the foregoing, all extensions and renewals thereof and all moral rights associated with any of the foregoing (collectively, "Copyrights"), (iv) trade secrets, technology, industrial and other designs, inventions, invention disclosures, discoveries, improvements, know-how, proprietary rights, formulae, confidential and proprietary information, technical information and documentation, customer and client information, client and customer lists, franchises, plans, advertising records, techniques, methods, algorithms, instructions, research records, inventions, designs, drawings, procedures, processes, models, formulations, manuals and systems, data, research, whether or not patentable or copyrightable, including all chemical, biochemical, toxicological, and material and information and data relating thereto and formulation, analytical and stability information and data, and any other information which has actual or potential commercial value and is not available in the public domain, and any registrations or applications for registration of any of the foregoing (collectively, "Technology"), (v) and all other going concern value, intellectual property or proprietary right, whether or not subject to statutory registration or protection (collectively, "Other IP Rights") and (vi) all rights to sue for past, present and future infringement or other violation of any of the foregoing.

"Knowledge" of any Person means (a) the actual knowledge of such Person and (b) that knowledge which should have been acquired by such Person after making such due inquiry and exercising such due diligence as a prudent businessperson would have made or exercised in the management of his or her business affairs, including due inquiry of those officers, directors, key employees and professional advisers (including attorneys, accountants and consultants) of such Person who could reasonably be expected to have actual knowledge of the matters in question.  When used in the case of the Seller, the term "Knowledge" shall include the Knowledge of the Stockholders.

- 9 -

"<u>Latest Balance Sheet</u>" has the meaning set forth in Section 4.6.

"<u>Latest Balance Sheet Date</u>" has the meaning set forth in Section 4.6.

"<u>Law</u>" means any law (including common law, statutory law and civil and criminal law), treaty, convention, rule, directive, legislation, ordinance, regulation (including, without limitation, statutory instruments, guidance notes, circulars, directives, decisions, rules, regulations and restrictions) or similar provision having the force of law or any Order.

"<u>Leased Real Property</u>" has the meaning set forth in Section 4.4(a).

"<u>Leased Worker</u>" means any contingent or worker provided by a staffing company, temporary employee agency, professional employer organization or similar entity.

"<u>Liability</u>" means any actual or potential liability or obligation (including as related to Taxes), whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, determined, determinable or otherwise, liquidated or unliquidated and whether due or to become due, regardless of when asserted.

"<u>Lien</u>" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, encumbrance or other adverse claim of any kind in respect of such property or asset, including, without limitation, any voting or other transfer restrictions. For the purposes of this Agreement, a Person shall be deemed to own, subject to a Lien, any property or asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such property or asset.

"<u>Losses</u>" means any and all losses (including incidental, consequential and special damages and a diminution in value in Assets or the Business), claims, shortages, damages, Liabilities, expenses (including reasonable attorneys' and accountants' and other professionals' fees and litigation expenses), assessments, Tax deficiencies and Taxes (including interest and penalties thereon) incurred in connection with the receipt of indemnification payments (including interest or penalties thereon) arising from or in connection with any such matter that is the subject of indemnification under Article X, whether or not foreseeable.

"<u>Marks</u>" has the meaning set forth in the definition of Intellectual Property Right.

"<u>Material Adverse Effect</u>" means any state of facts, change, event, effect or occurrence (whether or not constituting a breach of a representation, warranty or covenant set forth in this Agreement) that, individually or in the aggregate, is or may be reasonably likely to be materially adverse to the business, financial condition, results of operations, properties, assets or Liabilities of the Business or the Assets taken as a whole.

"<u>Material Contract</u>" has the meaning set forth in Section 4.11(a).

- 10 -

"<u>Merchants</u>" means those merchants whom have been solicited by Seller under the FDMS Agreement and who have entered into a Merchant Contract.

"<u>Merchant Contracts</u>" means, for any Merchant, any agreement between such Merchant on the one hand and Wells Fargo and FDMS on the other, and any other agreement pursuant to which the Seller receives revenue from a Merchant.

"<u>Non-Assignable Contracts</u>" has the meaning set forth in Section 7.2.

"<u>Orders</u>" means judgments, writs, decrees, compliance agreements, injunctions, orders, awards and legally binding determinations of any Governmental Entity, arbitrator or self-regulatory organization.

"<u>Other IP Rights</u>" has the meaning set forth in the definition of Intellectual Property Right.

"<u>Patents</u>" has the meaning set forth in the definition of Intellectual Property Right.

"<u>Permits</u>" means all permits, licenses, authorizations, filings or registrations, franchises, approvals, certificates (including, without limitation, certificates of need, construction and operation permits and safety certificates), exemptions, classifications, registrations, variances and similar documents, applications, rights obtained, or required to be obtained, from Governmental Entities.

"<u>Permitted Liens</u>" means (i)  the interests of the Associations, FDMS and Wells Fargo under the FDMS Agreement (ii) Liens for Taxes not yet due and payable for which adequate reserves have been established in accordance with GAAP, (iii) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and repairmen incurred in the ordinary course of business consistent with past practice and not yet delinquent and (iv) zoning, building, or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, (A) interfere in any material respect with the present use of or occupancy of the applicable property by the Seller or (B) have more than an immaterial effect on the value thereof or its use.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"<u>Personal Information</u>" means such term or like terms set forth in any Privacy Law that describes, covers or defines data that identifies or can be used to identify individuals either alone or in combination with other information which is in the possession of, or is likely to come into the possession of, the Seller, including a combination of an individual's name, address or phone number with any such individual's username and password, social security number or other government-issued number, financial account number, date of birth, email address, any information that can be used to contact someone or serve them with information (including identifiers used to engage in interest based advertising) or other personally identifiable information.

- 11 -

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date.

"Privacy Contracts" has the meaning set forth in Section 4.22(c).

"Privacy Laws" shall mean any Laws that relate to privacy, security, data protection and destruction, data breach notification or data transfer issues and all current and former privacy policies, guidelines and industry standards applicable to the Business, including the Digital Advertising Alliance's Industry Self-Regulatory Program for Online Behavioral Advertising and payment card industry data security standards.

"Privacy and Data Security Policies" has the meaning set forth in Section 4.22(a).

"Proceedings" means audits, examinations, actions, suits, claims, charges, complaints, demands, reviews, investigations and other legal, judicial, administrative or arbitral proceedings commenced, brought, conducted or heard before or by any Governmental Entity, arbitrator or self-regulatory organization.

"Program Standards" means (i) the credit criteria, standards and policies and procedures established by Service Providers in connection with the solicitation of merchants; (ii) the Service Providers' branding guidelines; and (iii) other policies, procedures, fines and penalties established by Service Providers that are designed to promote merchant satisfaction, preserve relationships with merchants, facilitate the growth of merchant service programs, and ensure the financial safety or soundness of Service Providers.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Purchase Price Allocation Schedule" has the meaning set forth in Section 3.3.

"Purchaser" has the meaning set forth in the introductory paragraph hereto.

"Purchaser Ancillary Documents" has the meaning set forth in Section 6.2.

"Purchaser Indemnified Parties" means the Purchaser and its respective successors and assigns, and each of their respective officers, directors, managers, employees, representatives and Affiliates.

"Receivables" has the meaning set forth in Section 4.19(a).

"Related Documents" means the Bill of Sale, the Assignment and Assumption Agreement, the Seller Ancillary Documents and the Purchaser Ancillary Documents.

"Release" means any actual or threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge,

- 12 -

dispersal, dumping, leaching or migrating into the environment (including the abandonment or discarding of barrels, containers, underground storage tanks and other closed receptacles), whether or not required to be reported or otherwise addressed under any Environmental Law.

"<u>Representatives</u>" shall mean a Person's designees, officers, counsel, accountants, actuaries, financing sources and other authorized representatives.

"<u>Residual Revenue Baseline</u>" means an amount equal to $186,000.

"<u>Restricted Business</u>" has the meaning set forth in Section 7.3(a).

"<u>Restricted Period</u>" has the meaning set forth in Section 7.3(a).

"<u>Restricted Person</u>" has the meaning set forth in Section 7.3(a).

"<u>SDP</u>" has the meaning set forth in Section 4.22(b).

"<u>Security Guidelines</u>" has the meaning set forth in Section 4.22(b).

"<u>Seller</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Seller Ancillary Documents</u>" has the meaning set forth in Section 4.2.

"<u>Seller Indemnified Parties</u>" means the Seller and each of its successors and assigns (other than the members of the Purchaser Indemnified Parties).

"<u>Seller Residual Portfolio</u>" means all of Seller's right, title, interest and entitlement to all Future Residuals payable from FDMS to Seller from and after January 1, 2017 and the right to receive all fees due from Merchants.

"<u>Service Providers</u>" means FDMS and Wells Fargo.

"<u>Software</u>" means all computer software and databases, including source code and object code, development tools, comments, user interfaces, menus, buttons and icons, and all files, data, scripts, application programming interfaces, manuals, design notes, programmers' notes, architecture, algorithms and other items and documentation related thereto or associated therewith, and any derivative works, foreign language versions, fixes, upgrades, updates, enhancements, new versions, previous versions, new releases and previous releases thereof; and all media and other tangible property necessary for the delivery or transfer thereof.

"<u>Stockholder</u>" has the meaning set forth in the introductory paragraph hereto.

"<u>Straddle Period</u>" has the meaning set forth in Section 8.3(b).

"<u>Tax Claim</u>" has the meaning set forth in Section 8.4(a).

- 13 -

FILED: NEW YORK COUNTY CLERK 03/04/2018 02:47 PM

"Tax Return" shall mean any report, return, declaration or other information required to be supplied to a Governmental Entity or any other Person in connection with Taxes, including estimated returns and reports of every kind with respect to Taxes and any amendments or attachments thereto.

"Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including gross income, net income, franchise, capital, real property, personal property, (whether tangible or intangible) withholding, payroll, employment, unemployment, environmental, payroll, social security, social contribution, disability, transfer, sales, use, excise, gross receipts, net receipts, gross proceeds, net proceeds, ad valorum, profits, gaming, stamp, lease, unclaimed property, value-added and all other taxes or customs duty of any kind imposed by any Governmental Entity, whether disputed or not, and any charges, interest or penalties imposed by any Governmental Entity in respect of Taxes.

"Technology" has the meaning set forth in the definition of Intellectual Property Right.

"Top Referral Sources" has the meaning set forth in Section 4.25(e).

"Tracking Application" means any Software disseminated by any entity on behalf of the Seller, or any of its Affiliates, that is installed on consumers' computers and used by any entity on behalf of the Seller to monitor, record or transmit information about activities occurring on the computers on which it is installed, or about data that is stored or created on, transmitted from or transmitted to the computers on which it is installed.

"Transaction Expenses" means all costs, fees and expenses incurred by the Seller or the Stockholders (to the extent the Seller pays or is obligated to pay such fees and expenses incurred, or payable, by the Seller or the Stockholders) in connection with the consummation of the transactions contemplated hereby, including, without limitation, any brokerage fees, commissions, finders' fees or financial advisory fees (including those payable to the Persons identified on Schedule 4.19) and accounting fees and expenses, to the extent unpaid prior to the Closing.

"Transfer Effective Date" has the meaning set forth in Section 2.1.

"Transfer Taxes" has the meaning set forth in Section 8.2.

"Transferred Employee" has the meaning set forth in Section 7.8(a).

"Underwriting Guidelines" has the meaning set forth in Section 4.23(a).

"Wells Fargo" means Wells Fargo Bank, N.A.

- 14 -

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1.**    **Agreement to Purchase and Sell.**

Subject to the terms and conditions of this Agreement, at the Closing, the Seller will grant, sell, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all right, title and interest of the Seller in, to and under the assets, properties and business, of every kind and nature, wherever located, real, personal or mixed, tangible or intangible, owned or held or used in the conduct of the Business by the Seller as the same shall exist as of December 31, 2016 at 11:59 PM ("the Transfer Effective Date") (other than the Excluded Assets), including, without limitation, all of the assets shown on the Latest Balance Sheet (other than the Excluded Assets), and all of the assets of the Business thereafter acquired by the Seller (which assets, properties and rights are collectively referred to in this Agreement as the "Assets"), free and clear of all Liens and the Purchaser will assume the Assumed Liabilities (as hereinafter defined).

**Section 2.2.**    **Assets.**

Except as otherwise expressly set forth in Section 2.3, the Assets shall include, without limitation, the following assets, properties and rights of the Seller and the Stockholders, in each case as such Assets relate to the Business:

(a)    all fixed assets, equipment, machinery, tools, furniture, vehicles, office supplies, fixtures and other tangible personal property and computer hardware;

(b)    all prepaid expenses, credits, advance payments, refunds, rights of set-off, rights of recoupment, retentions and deposits, including with respect to any Leased Real Property (other than any security deposit with regard to such Leased Real Property), personal property or free rental periods, pre-paid rent and other prepaid assets and prepaid expenses of the Seller;

(c)    all Contracts and all rights under any and all Contracts pertaining to the Business, including, without limitation, the leases for all Leased Real Property, the FDMS Agreement and those Contracts set forth on Schedule 2.2(c) (collectively, the "Assumed Contracts"), in all cases other than Excluded Contracts;

(d)    the Seller Residual Portfolio;

(e)    all Intellectual Property Rights, including all rights to the CRM gateway software and related source codes, the name "United Payment Services", together with the right to sue for past, present and future damages for infringement or other violation of owned Intellectual Property Rights;

(f)    all accounts receivable, notes receivable and other receivables and any security therefor;

(g)    all goodwill related to the Business;

- 15 -

(h)     all rights to causes of action, lawsuits, judgments, claims, other Proceedings and demands of any nature, whether arising by way of counterclaim or otherwise;

(i)     all rights in and under all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights;

(j)     all Permits, accreditations, qualifications, product registrations or similar rights, including, without limitation, those set forth on Schedule 4.18(a);

(k)     all information, books and records relating to the Business, including, without limitation, all records, accounting or other books and records of the Business, files, papers, client files, telephone numbers, customer, supplier, price and mailing lists, other customer information, client information, vendor information, marketing/buyer group information, sales, leasing and purchase correspondence, books of account and financial and employment records, data, plans, reports and recorded knowledge relating to the Business in whatever media retained or stored, including, without limitation, computer Software (collectively, the "Books and Records");

(l)     all personnel files of Transferred Employees, other than medical records and other personnel records that the Seller is prohibited from disclosing or transferring to the Purchaser under applicable Law or are required by applicable Law to retain in their possession;

(m)     all telephone, facsimile numbers and email addresses;

(n)     all rights to insurance proceeds paid or payable or other insurance benefits arising from or relating to any damage, casualty, destruction or similar loss of any Assets;

(o)     all Cash that is held for the benefit or on behalf of any client or customer or related to deferred revenues; and

(p)     all other tangible and intangible assets of any kind or description, wherever located, that are carried on the books of the Business, or which relate to the Business, or which are owned by the Seller, the Stockholders or any of their Affiliates and relate to the Business (it being understood that such Affiliates shall assign all such assets to the Seller prior to the Closing).

To the extent any assets or property owned by Affiliates of the Seller or the Stockholders (other than Excluded Assets) are used in the Business or have otherwise been assets of the Business historically, they shall be included within the defined term "Assets" if they would have been so included had they been owned by the Seller or the Stockholders and the Seller or Stockholders, as applicable, shall (and shall cause their Affiliates to) convey such assets and property to Purchaser at the Closing free and clear of all Liens for no additional consideration.

Section 2.3.     **Excluded Assets.**

Notwithstanding anything to the contrary set forth in this Agreement, the Assets will not include the following assets, properties and rights of the Seller (collectively, the "Excluded Assets"):

- 16 -

(a)      Cash, excluding Cash described in Section 2.2, accounts receivable and all rights to any bank accounts of the Seller, including checkbooks, cancelled checks and bank records;

(b)      all rights of the Seller under those Contracts identified on <u>Schedule 2.3(b)</u>, (collectively, the "<u>Excluded Contracts</u>");

(c)      the Company Benefit Plans and all assets thereof;

(d)      all rights of the Seller and Stockholders under this Agreement and the Related Documents;

(e)      the organizational documents of the Seller;

(f)      Future Residuals through the month ending December 31, 2016 to be paid in January 2017;

(g)      the Seller's rights under the Assumed Contracts to all revenues attributable to transactions before the Transfer Effective Date; and

(h)      refunds or claims for refunds due from federal, state and local Tax authorities with respect to federal, state and local income Taxes paid by the Seller for the Pre-Closing Tax Period.

**Section 2.4.      <u>Assumed Liabilities</u>.**

(a)      ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING, EXCEPT FOR THE ASSUMED LIABILITIES DESCRIBED IN SECTION 2.4(b), THE PURCHASER SHALL NOT AND THE PURCHASER DOES NOT ASSUME ANY LIABILITIES OF THE SELLER OR MANAGEMENT TEAM MEMBERS WHETHER OR NOT ARISING OUT OF OR RELATING TO THE ASSETS OR THE BUSINESS OR ANY OTHER BUSINESS OF THE SELLER OR MANAGEMENT TEAM MEMBERS, ALL OF WHICH LIABILITIES SHALL, AT AND AFTER THE CLOSING, REMAIN THE EXCLUSIVE RESPONSIBILITY OF THE SELLER OR THE APPLICABLE MANAGEMENT TEAM MEMBER.

(b)      As the sole exception to the provisions in Section 2.4(a), effective as of the Transfer Effective Date, the Purchaser will assume and agree to pay, discharge or perform, as appropriate, (a) the Seller's executory obligations under the Assumed Contracts, which obligations are to be performed, pursuant to the terms of such Assumed Contracts, on or after the Transfer Effective Date, including liability for chargebacks, card organization fines and other credit-related losses relating to transactions having an Acquirer's Processing Date after the Transfer Effective Date, and any expenses relating to transactions having an Acquirer's Processing Date after the Closing Date other than liabilities or obligations attributable to any failure of the Seller to comply with the terms of any such Assumed Contract prior to the Transfer Effective Date and (b) the obligations of the Seller under the Assumed Contracts, and then only to the extent such obligations (A) are not required to be performed prior to the Transfer Effective Date, (B) are disclosed on the face of such Assumed Contracts, (C) accrue and relate to the

- 17 -

operations of the Business subsequent to the Transfer Effective Date and (D) do not relate to a breach of any Assumed Contract that occurred on or prior to the Transfer Effective Date (collectively, the "Assumed Liabilities").

**Section 2.5.    Excluded Liabilities.**

Except for the Assumed Liabilities, in no event will the Purchaser assume, agree to pay, discharge or satisfy, or otherwise have any responsibility for, any Liability (together with all other Liabilities of the Seller that are not Assumed Liabilities, the "Excluded Liabilities"):

(a)    relating to any Liability (including, without limitation, accounts payable or intercompany amounts) owed by the Seller or a Stockholder to any Affiliate of the Seller or a Stockholder;

(b)    relating to any current liabilities other than Liabilities set forth on Section 2.4(b);

(c)    Excluded Taxes;

(d)    with respect to Indebtedness, including any interest or penalties accrued thereon;

(e)    to any employee, Governmental Entity or other Person, related to the operation of the Business on or prior to the Transfer Effective Date;

(f)    relating to, resulting from or arising out of (i) claims made in pending or future Proceedings or (ii) claims based on or arising out of alleged violations of Law as in effect at or prior to the Closing, breach of contract, employment matters or environmental, health and safety matters, alleged tortious conduct or any other actual or alleged misfeasance, malfeasance or failure of the Seller or any Stockholder to perform any obligation, in each case (i) and (ii) arising out of or relating to events which shall have occurred, or services performed, or the operation of the Business prior to the Transfer Effective Date;

(g)    relating to the ownership or operation of the Business or the Assets prior to the Transfer Effective Date, in each case arising under or imposed by any Environmental Law or any Environmental Condition;

(h)    to indemnify or reimburse amounts to any partner, officer, director or employee of the Seller other than as set forth herein;

(i)    pertaining to any Excluded Asset or relating to or arising from any Company Benefit Plan;

(j)    relating to all wages, bonuses, commissions, independent contractor payments, payroll, workers' compensation, unemployment benefits, stay, change of control, severance, bonus or similar payments due by the Seller to any Person and other accelerations or increases in rights or benefits of Seller's employees (or former employees) under any plan, agreement or arrangement of the Seller which obligation, in each case, either (A) arises at or

- 18 -

prior to the Closing or , (B) relates to any current or former employee or contractor of the Seller with respect to services rendered to the Seller, whether such obligations arise prior to, on or after the Transfer Effective Date, or (C) is payable or becomes due in whole or in part as a result of the consummation of the transactions contemplated by this Agreement, including all employer Taxes that are payable in connection with or as a result of the payment of such Liability;

(k)     relating to, resulting from or arising out of any former operations of the Seller that have been discontinued or disposed of prior to the Transfer Effective Date or relating to, resulting from or arising out of any operations of the Seller other than the Business;

(l)     Transaction Expenses;

(m)     arising out of any damage to real or personal property leased by the Seller which occurred prior to the Transfer Effective Date;

(n)     relating to the failure of the operation of the Business to have been in compliance with, any applicable Laws and Orders prior to the Closing;

(o)     relating to any failure by the Seller to possess all Permits required to conduct the Business or comply with any terms and requirements of its Permits prior to Closing;

(p)     relating to the classification of any Person who has performed services to, for, or on behalf of, the Business prior to Closing as an employee or an independent contractor, or as an exempt or non-exempt employee under the Fair Labor Standards Act of 1938, as amended, and comparable state and local laws; or

(q)     of the Seller or a Stockholder arising or incurred in connection with the negotiation, preparation and execution of this Agreement and the Related Documents and the transactions contemplated hereby and thereby and any Transactions Expenses.

Such Excluded Liabilities shall include all Proceedings relating to any or all of the foregoing and all costs and expenses in connection therewith.

## ARTICLE III
## PURCHASE PRICE; ADJUSTMENTS; ALLOCATIONS

Section 3.1.     **Purchase Price.**

(a)     The amount to be paid for the Assets (the "Purchase Price") shall be an amount equal to (i) the Closing Payment plus (ii) any payments payable under Section 3.2(b).

(b)     In addition to the foregoing payment, as consideration for the grant, sale, assignment, transfer and delivery of the Assets, the Purchaser shall assume and discharge the Assumed Liabilities, as such Assumed Liabilities mature according to their terms.

Section 3.2.     **Payment of Purchase Price.**

- 19 -

(a)     On the Closing Date, the Purchaser shall pay or cause to be paid to the Seller an amount equal to the Cash Purchase Price in accordance with the wire instructions set forth on Exhibit A hereto.

(b)     In addition to the Cash Purchase Price, Seller may be entitled to additional compensation from Purchaser in accordance with this Section 3.2(b):

(i)     In the event that the Purchaser has achieved monthly revenue of at least $158,000 (which is 85% of the Residual Revenue Baseline) in respect of the merchant accounts comprising the Seller Residual Portfolio for the month ending December 31, 2017 (which is paid in January, 2018), the Purchaser shall pay or cause to be paid to Seller an amount equal to $550,000.  Notwithstanding anything hereto, any attrition caused by the Purchaser or its agents moving Merchants to a processing company other than FDMS shall not be counted in the overall attrition attributed to Seller. For purposes of calculating the monthly revenue, the monthly revenue shall be adjusted for annual fees collected in an amount equal to one twelfth of the annual fee for each merchant scheduled for January, 2017 with respect to the Seller Residual Portfolio. The Purchaser agrees to commit to at least one annual rate increase with the consent of Sellers, such consent not to be unreasonably withheld, conditioned or delayed.  In the event that (i) costs set forth on the FD Agreement Schedule A on the date hereof increase, (ii) Purchaser does not pass such costs along to the merchant accounts comprising the Seller Residual Portfolio and (iii) such cost increases have a direct negative impact on the December 31, 2017 monthly revenue, such negative impacts shall be added back and shall count towards the calculation of such monthly revenue.

(ii)     In the event that the Purchaser has achieved monthly revenue of at least $133,920 (which is 72% of the Residual Revenue Baseline) in respect of the merchant accounts comprising the Seller Residual Portfolio for the month ending December 31, 2018 (which is paid in January, 2019), the Purchaser shall pay or cause to be paid to Seller an amount equal to $550,000. Notwithstanding anything hereto, any attrition caused by the Purchaser or its agents moving Merchants to a processing company other than FDMS shall not be counted in the overall attrition attributed to Seller. For purposes of calculating the monthly revenue, the monthly revenue shall be adjusted for annual fees collected in an amount equal to one twelfth of the annual fee for each merchant scheduled for January, 2018 with respect to the Seller Residual Portfolio. The Purchaser agrees to commit to at least one annual rate increase with the consent of Sellers, such consent not to be unreasonably withheld, conditioned or delayed.  In the event that (i) costs set forth on the FD Agreement Schedule A on the date hereof increase, (ii) Purchaser does not pass such costs along to the merchant accounts comprising the Seller Residual Portfolio and (iii) such cost increases have a direct negative impact on the December 31, 2018 monthly revenue, such negative impacts shall be added back and shall count towards the calculation of such monthly revenue.

(iii)     Subject to Section 3.2(b)(iv), any payment required pursuant to Section 3.2(b)(i) or Section 3.2(b)(ii) shall be paid within sixty (60) days following the end of the relevant measurement period.

(iv)     Notwithstanding the forgoing, Purchaser shall not be required to make the payments specified in Section 3.2(b)(i) and Section 3.2(b)(ii), if:

- 20 -

(A)      at the time such payment is due, Seller or the Stockholders has been in material breach of any of the representations, warranties, covenants, agreements or any other term or condition of this Agreement or any Related Document which breach remains uncured for thirty (30) days following notice thereof to Seller or Stockholder.

(B)      during the continuance of an event of default under its credit facility or facilities with any lending institution providing senior or mezzanine financing to Purchaser and its affiliates (an "Event Blockage"); *provided*, *however*, if any such payment is not made when due pursuant to Section 3.2(b)(i) or Section 3.2(b)(ii), as applicable, due to an Event Blockage, such amount shall be paid promptly once the event resulting in such Event Blockage has been cured or waived.

(v)      Any payment under this Section 3.2(b) paid or delivered to the Seller will be treated by the parties as additional Purchase Price under this Agreement.

### Section 3.3.      Allocation of Purchase Price.

Within ninety (90) days of the Final Determination Date, the Purchaser shall deliver to the Seller an allocation of the Purchase Price (and all Assumed Liabilities that are Liabilities for Tax purposes) among the Assets and the non-competition covenant contained in Section 7.3, which shall be mutually agreed upon by the Seller and the Purchaser (the "Purchase Price Allocation Schedule"). The Purchase Price Allocation Schedule will be prepared in good faith using commercially reasonable judgment in accordance with the applicable provisions of the Code and Purchaser shall use its reasonable efforts to allocate at least 90% of the Purchase Price (and all Assumed Liabilities that are Liabilities for Tax purposes) to the Seller Residual Portfolio; *provided*, that no more than $50,000 of the Purchase Price will be allocated in respect of the restrictive covenants set forth in Section 7.3. The Seller and the Purchaser shall file all Tax Returns consistently with the Purchase Price Allocation Schedule, as adjusted, and not take any position during the course of any audit or other proceeding that is inconsistent with the Purchase Price Allocation Schedule, as adjusted, except as required by a determination of a Governmental Entity that is final. The Purchaser and the Seller shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect changes in the Purchase Price.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Purchaser as follows:

### Section 4.1.      Organization; Capitalization; Subsidiaries.

(a)      The Seller is a corporation duly incorporated and validly existing under the Laws of its jurisdiction of formation.  The Seller has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  The Seller is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction in which the property leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except where failure to obtain such qualification or license would not, individually or in the aggregate, be reasonably likely to have a

- 21 -

Material Adverse Effect. The Seller has heretofore made available in the electronic data room to the Purchaser true, correct and complete copies of the Seller's organizational documents as currently in effect and the Seller's record books with respect to actions taken by its managers or directors (if any) and officers. <u>Schedule 4.1(a)</u> sets forth all of the trade names and fictitious business names (d/b/a's) used by the Seller.

(b)     <u>Schedule 4.1(b)</u> sets forth the authorized, issued and outstanding Equity Interests of the Seller. Except as set forth in <u>Schedule 4.1(b)</u>, there are no Equity Interests of the Seller issued, reserved for issuance or outstanding and no outstanding options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), unit appreciation rights, profits interests, calls or commitments of any character whatsoever to which the Seller is a party or may be bound requiring the issuance or sale of Equity Interests in the Seller.

(c)     Other than as set forth on <u>Schedule 4.1(c)</u>, the Seller does not own and has never owned, directly or indirectly, any Equity Interests, debt, participation, membership, partnership or similar interest in, or any interest convertible into or exchangeable or exercisable for any Equity Interests, membership, partnership or similar interest in, any corporation, partnership, joint venture, limited liability company or other business association or entity, whether incorporated or unincorporated.

**Section 4.2.     <u>Authorization.</u>**

The Seller has full power and authority to execute and deliver this Agreement and any other certificate, agreement, document or other instrument to be executed and delivered by it in connection with the transactions contemplated by this Agreement (collectively, the "<u>Seller Ancillary Documents</u>") and to perform its obligations under this Agreement and the Seller Ancillary Documents and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Seller Ancillary Documents by the Seller and the performance by the Seller of its obligations hereunder and thereunder and the consummation of the transactions provided for herein and therein have been duly and validly authorized by all necessary action on the part of the Seller. The members, managers and/or directors of the Seller have approved the execution, delivery and performance of this Agreement and the Seller Ancillary Documents and the consummation of the transactions contemplated by this Agreement and by the Seller Ancillary Documents. This Agreement has been, and the Seller Ancillary Documents will be as of the Closing Date, duly executed and delivered by the Seller and do or will, as the case may be, constitute the valid and binding agreements of the Seller, enforceable against the Seller in accordance with their respective terms.

**Section 4.3.     <u>Absence of Restrictions and Conflicts.</u>**

The execution, delivery and performance of this Agreement and the Seller Ancillary Documents, the consummation of the transactions contemplated by this Agreement and the Seller Ancillary Documents and the fulfillment of and compliance with the terms and conditions of this Agreement and the Seller Ancillary Documents do not or will not, as the case may be, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any party the right to

- 22 -

terminate, modify or cancel, or otherwise require any action, consent, approval, order, authorization, registration, declaration or filing (other than those obtained on or before the date hereof) with respect to (a) any term or provision of the organizational documents of the Seller, (b) any Assumed Contract or any other Contract, Permit or other instrument applicable to the Seller or the Business, (c) any Order to which the Seller is a party or by which the Business or any of the Assets is bound or (d) any Permit, Law or arbitration award of any Governmental Entity or public or regulatory unit, agency or authority applicable to the Seller or the Business.

### Section 4.4.    Real Property.

(a)      The Seller does not own any real property and is not a party to any Contract for the purchase of any real property.  Schedule 4.4(a) sets forth a complete and accurate list and description of all parcels of real property used in connection with the Business and leased by the Seller (together with all fixtures and improvements thereon, the "Leased Real Property").  The Seller is the owner and holder of a valid leasehold interest in the Leased Real Property, free and clear of any Liens, subtenancies and other occupancy rights, and has the right to occupy and use, now or in the future, such Leased Real Property in accordance with each respective lease.  The leases of the Leased Real Property are in full force and effect. All leases of Leased Real Property are in good standing and are valid, binding and enforceable in accordance with their respective terms and there does not exist under any such lease any default (or any claimed default) or any event which with notice or lapse of time or both, would constitute a default. The Seller has not received any notice that the owner of any Leased Real Property has made any assignment, pledge or hypothecation of the respective lease with respect thereto or use fees due thereunder.

(b)      The improvements on the Leased Real Property are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, and are adequate and suitable for the purposes for which they are presently being used.  To the Seller's Knowledge, the present use of the land, buildings, structures and improvements on the Leased Real Property is in material compliance with all applicable Laws. All certificates of occupancy and other permits or approvals legally required with respect to the occupancy and use of the Leased Real Property have been obtained and are currently in effect. There are no condemnation or appropriation or similar proceedings pending or, to the Seller's Knowledge, threatened against or affecting any Leased Real Property or any portion thereof or the improvements thereon.

### Section 4.5.    Title to Assets; Related Matters.

(a)      The Seller has (and will convey to the Purchaser at the Closing) good and marketable title to the Assets, free and clear of all Liens other than Permitted Liens.

(b)      The Assets constitute all of the assets necessary and sufficient to conduct the operations of the Business in accordance with the Seller's past practices and as presently planned to be conducted by the Purchaser. All equipment and other items of tangible personal property and fixed assets that are included in the Assets (i) are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, and usable in the regular and ordinary course of business and (ii) conform to all applicable Laws, ordinances, codes, rules and regulations applicable thereto, and to the Seller's Knowledge, there are no

- 23 -

material defects with any of the Assets.  No Person other than the Seller owns any equipment or other tangible personal property or assets situated on the premises of the Seller which are necessary to or used in the operation of the Business, except for the leased items that are subject to personal property leases.

(c)     Schedule 4.5(c) sets forth a true, correct and complete list and general description of each item of tangible personal property of the Seller used in the Business with an estimated value in excess of $5,000.

(d)     None of the personal or movable property constituting Assets is located other than at the Leased Real Property.

### Section 4.6.     Financial Statements.

Schedule 4.6 contains true, correct and complete copies of (i) the unaudited consolidated balance sheet of the Seller as of December 31, 2015, December 31, 2014 and December 31, 2013 and the related consolidated statements of income, members' equity and comprehensive income, and cash flows for the fiscal years then ended; and (ii) the unaudited consolidated balance sheet of the Business as of October 31, 2016 (the "Latest Balance Sheet" and the date thereof the "Latest Balance Sheet Date") and the related unaudited consolidated statements of income and cash flows for the ten-month period then ended ((i) and (ii) collectively, the "Financial Statements").  The Financial Statements (x) are in accordance with the books and records of the Seller; (y) present fairly, in all material respects, the financial condition of the Seller or the Business, as the case may be, as of the respective dates indicated and the results of operations, stockholders' equity (if provided) and cash flows (if provided) for the periods those financial statements cover; and (z) have been prepared in accordance with GAAP as consistently applied by the Seller in accordance with past practices except for the absence of footnote disclosure and, in the case of interim Financial Statements, subject to normal and recurring year-end adjustments (the effect of which will not be materially adverse). Since the Latest Balance Sheet Date, there has been no change in any of the accounting (or Tax accounting) policies, practices or procedures of the Seller.

### Section 4.7.     No Undisclosed Liabilities.

The Business has no Liabilities, except for (i) Liabilities on the Latest Balance Sheet; and (ii) Liabilities that have arisen since the Latest Balance Sheet Date in the ordinary course of business (provided that there is no such Liability that relates to breach of Contract, breach of warranty, tort, infringement, violation of Law, Order or Permit, or any Proceeding, in each case as in effect on or before the Closing Date).  Except as set forth on Schedule 4.7, the Business has neither expressly or by operation of Law, assumed nor undertaken any Liability of any other Person.

### Section 4.8.     Absence of Certain Changes.

Since December 31, 2015 and except as set forth in Schedule 4.8, there has not been:

- 24 -

(a)    any event, occurrence, development or state of circumstances or facts which, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect,

(b)    any damage, destruction, loss or casualty to property or assets of the Business, whether or not covered by insurance,

(c)    any sale, transfer, license, pledge, mortgage or other disposition of tangible or intangible assets by the Business outside the ordinary course of business consistent with past practice,

(d)    any declaration, setting aside, payment of any distribution in respect of any of the Equity Interests of the Seller, or payment or other consideration of any kind to any Stockholder or Affiliate of the Seller, other than guaranteed payments, salary and ordinary course reimbursements,

(e)    any incurrence by the Seller of, or commitment by the Seller to incur or otherwise become liable in respect of, any Indebtedness, other than borrowings in the ordinary course of business, including purchase money security interests, mechanics' liens, equipment financing and ordinary course trade payables,

(f)    cancellation or compromise or agreement to cancel or compromise any Indebtedness owed to the Seller or written claim of the Seller,

(g)    any transfer or grant of any license under any Intellectual Property Rights owned or used by the Seller in the Business,

(h)    any waiver of any other rights held by the Seller or Stockholders other than in the ordinary course of business consistent with past practice,

(i)    any acquisition of real property or undertaking or commitment to undertake capital expenditures exceeding $25,000 in the aggregate related to the Business,

(j)    any grant of any increase in or acceleration of payment of the compensation or benefits of any of the Seller's employees, consultants, independent contractors or Leased Workers, or entry into any employment, consulting, independent contractor, or staffing, sale bonus, stay bonus, profit sharing, incentive, severance Contract or collective bargaining agreement for the benefit of any employee, consultant, independent contractor or Leased Worker of the Seller,

(k)    any material change or agreement to make any material change in the customary methods of financial accounting or financial accounting practices of the Seller, except as required by GAAP,

(l)    any settlement of, or agreement to settle, any Proceeding, claim or other legal action,

(m)    any change or modification of the Seller's Underwriting Guidelines,

- 25 -

(n)       any opening of any merchant accounts or entrance into any Merchant Contracts except in compliance with the Underwriting Guidelines and the rules and underwriting guidelines of the Service Providers and in the ordinary course of business, or

(o)       any Contract for the Seller to take any of the actions specified in this Section 4.8.

**Section 4.9.      Legal Proceedings.**

Except as set forth on Schedule 4.9:

(a)       There are no Proceedings pending or, to the Seller's Knowledge, threatened against the Seller or, to the Seller's Knowledge, any of the current or former officers, directors or employees of the Seller in their capacity as such, by or before any Governmental Entity or any mediator or arbitrator, nor, to the Seller's Knowledge, is there any reasonable basis for any such Proceeding.

(b)       There is no Proceeding pending or threatened by the Seller by or before any Governmental Entity or any mediator or arbitrator.

Schedule 4.9 sets forth a complete and correct list of all Proceedings whether by or against the Seller and resolved in the past three (3) years. Schedule 4.9 sets forth any judgment, order or decree of any Governmental Entity related to the Business to which the Seller is subject.

**Section 4.10.      Compliance with Laws.**

(a)       The Seller is (and has been at all times since the date of its formation) in material compliance with all Laws applicable to the Assets or the conduct of the Business.  Since the Seller's formation, the Seller (i) has not been charged with and, is not now under investigation with respect to, any actual or alleged violation of any applicable Law or other requirement of a Governmental Entity and (ii) has filed all reports required to be filed with any Governmental Entity and has all Permits required to be held on or before the date hereof and all such reports are accurate and complete in all respects and in compliance with all applicable Laws.

**Section 4.11.      Contracts.**

(a)       Schedule 4.11(a) sets forth a true, correct and complete list of the following Contracts related to the Business to which the Seller is a party or by which it or the Business is bound (each a "Material Contract"):

(i)       any bond, debenture, note, loan, credit or loan agreement or loan commitment, mortgage, indenture, guarantee or other Contract relating to Indebtedness or binding upon any of the Assets;

(ii)       any lease relating to the Leased Real Property or other lease or license involving any properties or assets (whether real, personal or mixed, tangible or intangible) for which the annual rental exceeds $10,000;

- 26 -

(iii)     Contract (A) containing any covenant limiting the right of the Seller or any Employee to freely engage in any line of business, to compete with any Person in any line of business or to compete with any Person or the manner or locations in which any of them may engage, or (B) prohibiting or limiting the right of the Seller to make, sell or distribute any products or services;

(iv)     any licensing agreement or other agreement related to the Intellectual Property;

(v)     any employment Contract, sales commission agreement or any collective bargaining agreement;

(vi)     any Contract with, or obligation or commitment with respect to any independent contractors, consultants or Leased Workers;

(vii)     any agency, brokerage or other agreement with any insurance company;

(viii)     any Contract for capital expenditures or the acquisition or construction of fixed assets by the Seller;

(ix)     any Contract that provides for an increased payment or benefit, or accelerated vesting, upon the execution of this Agreement or in connection with the transactions contemplated hereby;

(x)     any Contract granting any Person a Lien on all or any part of any of the Assets;

(xi)     any Contract granting to any Person an option or a first refusal, first-offer or similar preferential right to purchase or acquire any assets;

(xii)     any Contract related to the Seller's information technology systems having compensation or payment exceeding $10,000 in any 12-month period;

(xiii)     any Contract for the granting or receiving of a license or sublicense or under which any Person is obligated to pay or have the right to receive a royalty, license fee or similar payment;

(xiv)     any Contract providing for the indemnification or holding harmless of any officer, director, employee or other Person;

(xv)     any joint venture or partnership Contract;

(xvi)     any Contract with any Service Provider or Association;

(xvii)     Contracts with any Top Referral Source;

- 27 -

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 36 of 104

(xviii) Contract pursuant to which the Seller has agreed to provide "most favored nation" pricing or any arrangement whereby the Seller has agreed with any Person that such Person will receive the most favorable terms and conditions that are provided by the Seller to any other Person;

(xix)   Contracts that provide for the payment of any cash or other compensation or benefits or an increased payment or benefit, or accelerated vesting, in each case upon consummation of the transactions contemplated hereby;

(xx)   distributor, operator or customer agreements having an annual compensation or payment exceeding $100,000 in any 12-month period;

(xxi)   any outstanding power of attorney empowering any Person to act on behalf of the Seller; and

(xxii)   any other existing Contract (other than those described in subparagraphs (i) through (xxii) of this Section 4.11(a)) material to the Business.

True, correct and complete copies of the Contracts required to be set forth on Schedule 4.11(a) have been made available to the Purchaser in the electronic data room.

(b)   The Assumed Contracts are legal, valid, binding and enforceable in accordance with their respective terms with respect to the Seller and with respect to each other party to such Assumed Contracts.  There are no existing defaults or breaches of the Seller under any Assumed Contract (or events or conditions which, with notice or lapse of time or both, would constitute a default or breach) and there are no such defaults (or events or conditions which, with notice or lapse of time or both, would constitute a default or breach) with respect to any third party to any Assumed Contract.  To the Seller's Knowledge, there are no pending or threatened bankruptcy, insolvency or similar proceedings with respect to any party to such Contracts.

(c)   Schedule 4.11(c) identifies each Assumed Contract set forth therein that requires the consent of or notice to the other party thereto to avoid any breach, default or violation of such Contract in connection with the transactions contemplated hereby, including the assignment of such Assumed Contract to the Purchaser.

**Section 4.12.**   **Insurance Policies.**

Schedule 4.12 contains a complete and correct list of all insurance policies relating to the Business, the Assets or the Assumed Liabilities carried by or for the benefit of the Seller which are currently in effect, specifying the insurer, policy number, amount of and nature of coverage, the deductible amount (if any) and the date through which coverage will continue by virtue of premiums already paid.  The Seller maintain insurance with reputable insurers for the Business and Assets against all risks normally insured against, and in amounts normally carried, by Persons of similar size engaged in similar lines of business, and such coverage is sufficient. Schedule 4.12 also sets forth all relevant information as to the nature and approximate amount of all claims for insured losses sustained by the Seller.  The Seller has not reached or exceeded its policy limits for any insurance policies in effect at any time during the past five (5) years.  There

- 28 -

is no claim by the Seller pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds or in respect of which such underwriters have reserved their rights.  All premiums payable under all such policies and bonds have been timely paid, and the Seller has otherwise complied fully with the terms and conditions of all such policies and bonds.  To the Seller's Knowledge, there is no threatened termination of, premium increase with respect to, or material alteration of coverage under, any of such policies or bonds.

**Section 4.13.**     **Environmental, Health and Safety Matters.**

Except as set forth in Schedule 4.13:

(a)     the Seller has been and is in full compliance with Environmental Laws, and possesses, maintains in good standing and is in full compliance with, all Permits required under Environmental Laws;

(b)     no notice, demand, request for information, citation, summons or Order has been received, no complaint has been filed, no penalty has been assessed and no Proceeding is pending or, to the Seller's Knowledge, threatened by any Governmental Entity or other Person with respect to any matters relating to the Seller, the Business or the Assets arising out of any Environmental Law;

(c)     there are no material Liabilities arising in connection with or in any way relating to the Assets, the Business or the Leased Real Property of any kind whatsoever, arising under or relating to any Environmental Law or Hazardous Materials, and there are no facts, events, conditions, situations or set of circumstances, including notice of actual or threatened Liability under CERCLA or any similar foreign, state or local statute or ordinance from any Governmental Entity or any Person, which could reasonably be expected to result in or be the basis for any such Liability;

(d)     no Hazardous Material has been Released at, on or under any Leased Real Property or any other property now or previously owned, leased or operated by the Seller; and

(e)     the Seller has not imported, manufactured, stored, used, operated, transported, treated or disposed of any Hazardous Materials other than in full compliance with all Environmental Laws and Permits issued pursuant to Environmental Laws.

For purposes of this Section 4.13, the term "Seller" shall include any entity which is, in whole or in part, a predecessor of the Seller.

**Section 4.14.**     **Intellectual Property.**

(a)     Schedule 4.14(a) sets forth a true and correct list of all Intellectual Property Rights which are used or useful in the Business or relate to the Assets or Assumed Liabilities (the "Intellectual Property") and the jurisdictions where each is registered (if any). The Seller has good and marketable title to or possesses adequate written licenses or other valid rights to use such Intellectual Property, free and clear of all Liens. For each item of Intellectual

- 29 -

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 38 of 104

Property owned or purported to be owned by the Seller, the Seller is the exclusive owner of such item and such item of Intellectual Property is valid and enforceable.

(b)    The activities of the Seller, if any, relating to the development, manufacture, marketing, use, sale, distribution, import, export or other commercial exploitation of the Business and the products and services of the Business have not infringed, misappropriated or otherwise violated, and do not infringe, misappropriate or otherwise violate, any Intellectual Property Rights of any third party.  No right, license, lease, consent or other agreement is required with respect to any Intellectual Property for the conduct of the Business other than those included in the Assets.

(c)    No party has filed a claim or, to the Seller's Knowledge, threatened to file a claim against the Seller alleging that it has violated, misappropriated, infringed on or otherwise improperly used the Intellectual Property Rights of such party.

(d)    The Intellectual Property is not subject to any litigation proceeding or outstanding consent decree, order or judgment.  No party is infringing or misappropriating any Intellectual Property.  To the Seller's Knowledge, none of the Intellectual Property (including registrations or applications to use or register such items) is involved in any cancellation, nullification, interference, conflict, concurrent use or opposition proceeding, and there has been no threat or other indication that any such proceeding will hereafter be commenced.  All maintenance fees, annuity fees, or renewal fee payment, and all renewal affidavits or other applicable documents to establish or maintain, for each jurisdiction in which each Patent, Mark, Copyright, domain name or domain name application included within the Intellectual Property which has issued or is pending have been timely paid or filed with the appropriate authorities, and no such payment or filing is or will be due less than 90 days after the Closing Date.  The Seller has used commercially reasonable efforts to maintain its Technology in confidence, and to the Seller's Knowledge there has been no misappropriation of any Technology.  All employees of, consultants to or vendors of the Seller with access to any Technology are parties to written agreements under which each such employee, consultant or vendor is obligated to maintain the confidentiality of the Technology and all employees of, consultants to or vendors of the Seller with access to any Technology who have developed any material Intellectual Property for the Seller are parties to written agreements under which each such employee, consultant or vendor is obligated to assign the Intellectual Property to the Seller. To the Seller's Knowledge, none of such employees, consultants or vendors is in violation of such agreements.

(e)    The Intellectual Property is sufficient for the continued conduct of the Business after Closing in substantially the same manner as conducted prior to the Closing.  The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, will not result in or give rise to any right of termination or other right to impair or limit, or otherwise result in a breach of, any of the Seller's right to own or retain a license to any of the Intellectual Property.  Immediately subsequent to the Closing, all Intellectual Property will be owned or available for use by the Purchaser on the same or substantially similar terms and conditions to those under which Seller owned or used such Intellectual Property immediately prior to the Closing without payment of any additional fees.

**Section 4.15.    <u>Transactions with Affiliates</u>.**

- 30 -

Except as set forth in <u>Schedule 4.15</u>, no officer or partner of the Seller, or any person with whom any such officer or partner has any direct or indirect relation by blood, marriage or adoption, or any entity in which any such Person owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than five percent (5%) of the stock of which is beneficially owned by all such Persons in the aggregate) or any Affiliate of any of the foregoing or any current or former Affiliate of the Seller has any interest in:  (a) any Contract, arrangement or understanding with, or relating to, the Business, the Assets or the Assumed Liabilities;  (b) any loan, arrangement, understanding, agreement or Contract for or relating to the Business, the Assets or the Assumed Liabilities; or (c) any property (real, personal or mixed), tangible or intangible, used or currently intended to be used by the Seller relating to the Business, the Assets or the Assumed Liabilities.  <u>Schedule 4.15</u> also sets forth a complete list of all accounts receivable, notes receivable and other receivables and accounts payable owed to or due from any Affiliate to the Seller relating to the Business, the Assets or the Assumed Liabilities.  <u>Schedule 4.15</u> also sets forth all compensation, fees, benefits and other amounts paid to any Affiliate of the Seller since January 1, 2016.

### Section 4.16.    <u>Undisclosed Payments.</u>

Neither the Seller, the officers, managers or directors of the Seller, nor anyone acting on behalf of any of them, has made or received any payments not correctly categorized and fully disclosed in the Seller's books and records in connection with or in any way relating to or affecting the Business, the Assets or the Assumed Liabilities.

### Section 4.17.    <u>Employees; Consultants; Labor Matters; Company Benefit Plans.</u>

(a)    <u>Schedule 4.17(a)</u> sets forth a true and complete list of all of the employees of the Business as of the date of this Agreement, specifying for each the current position, employment status (active or description of leave), employment classification (full-time or part-time and exempt or non-exempt under the Fair Labor Standards Act), 2015 and current annual salary or hourly wage rate, 2016 bonus target and 2015 and 2016 bonus paid or currently accrued , commission or fee arrangement, commissions or fees paid or accrued for 2016 and accrued vacation, with an appropriate notation as to any Person on such list who is subject to any written employment Contract.  The Seller has not made any written or oral commitment to any employee, consultant, independent contractor or Leased Worker with respect to compensation, promotion, retention, termination, severance or similar matters in connection with the transactions contemplated by this Agreement.

(b)    The employees of the Seller, and the consultants, independent contractors and Leased Workers providing services to the Seller, have not been, and currently are not, represented by any labor organization or group whatsoever.  The Seller has not been and is not a signatory to any collective bargaining agreement, and the Business has not been and is not subject to or bound by any collective bargaining agreement.  There has not been any, and there is no pending or, to the Seller's Knowledge, threatened, union organizing campaign or other attempt to organize or establish a labor organization involving or representing employees of the Seller or any consultant, independent contractor or Leased Worker providing services to the Seller.  There has not been any, and there is no pending, or to the Seller's knowledge, threatened,

petition, demand for recognition or other application for certification as a collective bargaining representative for any bargaining unit of employees, or otherwise against or affecting the Business. There has not been any, and there is no pending or, to Seller's Knowledge, threatened, labor strike, material dispute, grievance, picketing, labor dispute, walkout, work stoppage, slowdown or lockout involving the Seller or the Business.

(c)     Except as set forth on Schedule 4.17(c), no workers' compensation or retaliation Proceeding is pending, or, to the Seller's Knowledge, threatened, against the Seller, and the Seller has maintained and currently maintains adequate insurance as required by applicable Law with respect to workers' compensation claims and unemployment benefits claims.

(d)     The Seller are in compliance with all applicable Laws and Contracts concerning or pertaining to labor, employment or alleged employment, including any Laws governing or concerning terms and conditions of employment, collective bargaining, termination of employment, equal employment opportunity, nondiscrimination, harassment, retaliation, wages, hours, benefits, occupational safety and health, workers' compensation, employment practices, affirmative action, labor relations, immigration, temporary workers, independent contractors, Leased Workers, protection of employee data and personal information, the withholding and payment of social security and other payroll taxes and plant closings or layoffs (collectively "Employment Laws"). All consultants and independent contractors utilized by the Seller in the operation of the Business are properly characterized as, and have always been properly characterized as, independent contractors of the Business. At no time has the Seller ever treated a consultant or independent contractor as an employee of the Seller nor has the Seller ever issued a W-2 with respect to any consultant or independent contractor that provided services for or on behalf of the Seller. No employee, consultant, independent contractor or Leased Worker has been misclassified with respect to application of any Employment Laws or other Laws. The Seller has not used the services of individuals who have provided services while classified as independent contractors to an extent that they would be eligible to participate in any Company Benefit Plan .

(e)     Except as set forth on Schedule 4.17(e), there are no Proceedings pending or, to the Seller's Knowledge threatened, against, relating to, involving or otherwise affecting the Seller or the Business with respect to any employee, former employee, applicant for employment, Leased Worker, independent contractor or consultant arising out of employment, alleged employment or any alleged violation of any Employment Law, including any alleged misclassification of any current, former or prospective employee, Leased Worker, independent contractor or consultant.

(f)     The Seller is not and has never been, a government contractor or subcontractor obligated to have an affirmative action plan.

(g)     The Seller has not taken any action within the past two (2) years that could constitute a "plant closing" or "mass layoff" within the meaning of the Worker Adjustment and Retraining Notification Act or any applicable similar state or local law or otherwise trigger any notice requirement or Liability under any applicable group termination Law.

(h)     Schedule 4.17(h) sets forth a true, complete and accurate list of each Company Benefit Plan. The Seller has made available to the Purchaser true, complete and correct copies of

- 32 -

the following documents with respect to each Company Benefit Plan, to the extent applicable: (i) the current plan document, including all amendments thereto, and in the case of unwritten Company Benefit Plans, written descriptions thereof; (ii) the most recent summary plan description and summary of material modifications thereto; (iii) the most recent determination or opinion letter received from the Internal Revenue Service with respect to each such Company Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code; and (iv) the most recent annual report on Form 5500 (including any applicable schedules and attachments thereto).

(i)     Each Company Benefit Plan has been established, maintained, administered and funded in compliance with, and currently complies with, its terms and all applicable Laws (including ERISA and the Code) in all material respects.  The Seller has timely made all required contributions, distributions, reimbursements and premium payments on account of each Company Benefit Plan.

(j)     Each Company Benefit Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable and current determination letter from the Internal Revenue Service, or with respect to a prototype plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan sponsor, as to the tax qualification of such Company Benefit Plan under Section 401(a) of the Code and the exemption of the related trust from Federal income taxation under Section 501(a) of the Code.  No fact or event has occurred since the date of such letters that would reasonably be expected to adversely affect such qualified status or tax exempt status.

(k)     Each Company Benefit Plan that is subject to Section 409A of the Code is in compliance with the currently applicable requirements of Section 409A and the regulations, rulings and notices promulgated thereunder so that the additional tax described in Section 409A(a)(1)(b) will not be assessed with respect to benefits payable thereunder, and none of the Seller has any obligation for any Taxes (or potential Taxes) imposed (or potentially imposed) on any employees of the Seller under Section 409A of the Code.

(l)     None of the Seller or any of its ERISA Affiliates sponsors, maintains, administers, or contributes to, or has in the past sponsored, maintained, administered, or contributed to, or has had or could have any Liability with respect to, (i) any plan subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code, (ii) any "multiemployer plan" (as defined in Section 3(37) of ERISA), (iii) any "multiple employer plan" (as defined in Section 413(c) of the Code), or (iv) any "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

(m)     There are no Proceedings pending or, to the Seller's Knowledge, threatened against the Seller relating to a Company Benefit Plan (other than routine claims for benefits).

(n)     Except as may be required by COBRA or any similar state Laws, no Company Benefit Plan provides benefits or coverage following retirement or other termination of service.  Schedule 4.17(n) sets forth a true, complete and correct list of all Liabilities of any of the Seller to provide "continuation coverage" to former employees of any of the Seller and their covered

- 33 -

dependents with respect to all qualifying events under COBRA and similar state Laws that occurred prior to the Closing.

(o)       Neither the execution and delivery of this Agreement nor the consummation of the contemplated transactions will (either alone or in conjunction with any other event) result in, accelerate the vesting, funding, or delivery of, or increase the amount or value of, any payment or benefit to any current or former employee, officer or director of or consultant to any of the Seller.

(p)       The Seller has not entered into any agreements and is not otherwise obligated to pay, does not pay and has never paid, any residual commissions to any employee, consultant or independent contractor of the Companies for past sales or lead generation other than Kari Gibson and John Nauta.

Section 4.18.       **Permits.**

(a)       Schedule 4.18(a) contains a true, correct and complete list of all Permits maintained by the Seller and the Seller has furnished or made available in the electronic data room to the Purchaser true, correct and complete copies of these Permits.  The Seller has taken all necessary action to maintain each such Permit.  The Seller has all material Permits necessary for its operations in the conduct of the Business. Such Permits are valid, binding and in full force and effect and no violations are or have been recorded in respect of any thereof, and no Proceeding is pending or, to the Seller's Knowledge, threatened to revoke or limit any thereof. Except as set forth on Schedule 4.18(c), none of the Permits required to be set forth on Schedule 4.18(a) shall be adversely affected as a result of the Seller's execution and delivery of, or the performance of its obligations under, this Agreement or the consummation of the transactions contemplated hereby.  No loss or expiration of any Permit is pending, reasonably foreseeable or, to the Seller's Knowledge, threatened.

(b)       Schedule 4.18(b) identifies each Permit maintained by the Seller with respect to the Business that is not assignable to the Purchaser in connection with the transactions contemplated hereby.

(c)       Schedule 4.18(c) identifies each Permit maintained by the Seller with respect to the Business that requires the consent of or notice to any Governmental Entity or any other party to avoid any breach, default or violation of such Permit in connection with the transactions contemplated hereby.

Section 4.19.       **Brokers, Finders and Investment Bankers.**

Except as set forth on Schedule 4.19, none of the Seller, any officers, partners or employees of the Seller nor any Affiliate of the Seller has employed any broker, finder or investment banker or incurred any Liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated by this Agreement.

Section 4.20.       **Taxes.**

- 34 -

(a)     The Seller has complied in all material respects with all Laws relating to Taxes. The Seller has timely filed (or caused to be timely filed) all Tax Returns required to be filed by the Seller and all such Tax Returns are true, complete and correct in all respects.

(b)     The Seller has timely paid (or caused to be timely paid) all Taxes (whether or not shown on any Tax Return) required to be paid on or prior to the Closing Date. The Seller has complied in all respects with all applicable Laws relating to the collection and withholding of Taxes (including all sales or use Taxes and all Taxes required to have been withheld and paid in connection with amounts paid or owed to any employee, independent contractor, creditor, member, manager, stockholder or any other third party), and timely and properly remitted all withheld Taxes to the appropriate Governmental Entity.

(c)     The Seller has fully reserved on its books and records all Taxes for Pre-Closing Tax Periods and the portion of any Straddle Periods ending on the Closing Date (as determined under Section 8.3(b)).

(d)     No audits or other proceedings are currently in progress, pending or, to the Seller's Knowledge, threatened with regard to any Taxes of the Seller or that are attributable to the Assets or the Business. There are no unpaid or proposed assessments for Taxes with respect to any of the Assets. The Seller has not entered into any agreement that could affect any Taxes (or the expiration of the statute of limitations) attributable to the Assets or Business for a Post-Closing Tax Period or Straddle Period.

(e)     No claim has ever been made by any Governmental Entity in a jurisdiction in which the Seller does not file Tax Returns that the Seller is or may be subject to taxation by that jurisdiction, and no basis exists for any such claim to be made.

(f)     There are no Liens for Taxes upon any of the Assets.

(g)     The Seller is not liable for any Taxes: (i) under any agreement (including any Assumed Contract), (ii) as a transferee or successor or (iii) under Treasury Regulation Section 1.1502-6(a) or any analogous or similar state, local or foreign Law or regulation.

(h)     The Seller has duly elected to be treated as an S corporation pursuant to Section 1362(a) of the Code and the Laws of each state and other jurisdiction in which the Company conducts business or could otherwise be subject to income Taxes. Each of these elections was initially effective as of the Seller's date of incorporation and is currently effective. No event has occurred (or fact has existed) that would preclude the Seller from initially qualifying as an S corporation under Section 1361(a) of the Code or which would terminate the Seller's S corporation status. No Governmental Entity has challenged the effectiveness of any of these elections.

**Section 4.21.    Compliance with Associations, Service Providers and Program Standards.**

(a)     The Seller is in compliance in all material respects with (i) all Association Requirements that are applicable to it or to the conduct of the Business, (ii) all rules and underwriting guidelines of Service Providers and Associations and (iii) all rules applicable to

- 35 -

Case 1:18-cv-02669-PKC    Document 1-2    Filed 03/26/18    Page 44 of 104

member service providers and independent sales organizations. No event has occurred, and, to the Seller's Knowledge, no condition or circumstance exists, that would reasonably be expected to (with or without notice or lapse of time) constitute or result in a material violation by the Seller of, or a failure on the part of the Seller to comply with, any of the foregoing. The Seller has not received any notice or other communication (in writing or otherwise) or any fine or penalty from any Association regarding a violation of, or failure to comply with, any of the foregoing.

(b)     The Seller is in compliance with all Program Standards. No Service Provider has notified the Seller of any violation or potential violation of the Program Standards. The Seller has no Knowledge of any action or omission which could be considered to be a violation of the Program Standards or which could have an adverse effect on the Business or the Assets. Except as set forth in Schedule 4.21, the Seller has not received any notice from any Service Provider relating to an increase in fees, costs, or interchange. The Seller has not received any notice from any Association relating to an increase in fees, costs, or interchange other than fees, costs or interchanges that have been increased on an industry-wide basis.

**Section 4.22.    Consumer Privacy**

(a)     The Seller has implemented and maintained commercially reasonable information security measures consistent with industry standards relating to the collection, use, storage, processing, transfer, disclosure, and protection of, Customer Information or any media containing Customer Information, including, without limitation, a publicly available privacy policy and written information security policies ("Privacy and Data Security Policies"), and the Seller is in compliance in all material respects with such Privacy and Data Security Policies. The Seller has reasonable safeguards in place to protect Customer Information in its possession or control from unauthorized access by third persons, including the Company's employees and independent contractors. There has been no unauthorized access, use, or disclosure of Customer Information in the possession or control of the Seller, and, to the Seller's Knowledge, any of its respective independent contractors. The Seller has never experienced any such access, misuse, or loss that could compromise (or threatened to compromise) the security, confidentiality or integrity of such Customer Information. The Seller contractually requires all third parties who have access to or receive Customer Information from the Seller to comply with all applicable Laws regarding the use of such Customer Information, and to use commercially reasonable efforts consistent with customary industry standards and practices, applicable Law, and privacy policies to store and secure all Customer Data to protect against unauthorized access to or use of such Customer Data.

(b)     The Seller has complied in all material respects with all Privacy Laws and Association Requirements concerning the collection, storage, use, disclosure, and transfer of Customer Information, data protection and e-commerce and with all security standards and guidelines that have been published from time to time by any Association or any other processor, provider or sponsor, including, without limitation, the Visa U.S.A. Cardholder Information Security Program ("CISP"), MasterCard Site Data Protection Program ("SDP"), any similar rules issued by American Express Travel Related Services, Inc., the Bank Secrecy Act, anti-money laundering laws, OFAC, the USA Patriot Act and other similar laws (collectively, the "Security Guidelines"). The Seller is and has been compliant, in all material respects, with CISP, SDP, any

- 36 -

similar rules issued by American Express Travel Related Services, Inc. and the Security Guidelines. To the Seller's Knowledge, no individual or entity has gained unauthorized access to any computers, computer software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, or other information technology equipment, and associated documentation used by the Seller or any data stored thereon. To the Seller's Knowledge, no Service Provider has received a "common point of purchase," "point of compromise" or similar notice, letter or inquiry relating to the Seller's activities, merchant account or solicited merchants.

(c)     The Seller is and always has been in material compliance with all Contracts between any of the Seller and any Person that are applicable to the collection, use or disclosure of Personal Information ("Privacy Contracts"), and has collected Personal Information in compliance with all Privacy Laws and with appropriate disclosures and consents as required to provide the Privacy Information to third parties in the course of the Business. The Seller has delivered to Purchaser accurate and complete copies of all of the Privacy and Data Security Policies and Privacy Contracts. No Personal Information has been (A) collected, used, stored or otherwise interacted with by the Seller in violation of any Privacy Laws, Privacy and Data Security Policies or Privacy Contracts or (B) transferred or disclosed by the Seller to any Person in violation of any Privacy Laws, Privacy and Data Security Policies or Privacy Contracts. The Seller does not use any of the Personal Information they receive through any websites or otherwise in connection with the Business in a manner that in any way violates any Privacy Law, Privacy and Data Security Policies or Privacy Contracts. The Seller has not used any Tracking Applications in a manner that violates any Law or applicable industry guideline (including the Digital Advertising Alliance's Industry Self-Regulatory Program for Online Behavioral Advertising).

(d)     The Seller has reasonable safeguards in place to protect Personal Information in its possession or control from unauthorized access by any Person, including the Seller's employees and contractors. There has been no unauthorized access, use, or disclosure of Personal Information in the possession or control of the Seller, and, to the Seller's Knowledge, any of the Seller's contractors.

(e)     The Seller contractually requires all third parties, including vendors, affiliates, and other persons providing services to the Seller who have access to or receive Personal Information from the Seller to comply with all applicable Laws regarding the use of such Personal Information, and to use commercially reasonable efforts consistent with industry standards, the Privacy and Data Security Policies and all other applicable privacy policies to store and secure all Personal Information to protect against unauthorized access to or use of the Personal Information.

(f)     The Seller has not received any oral, written or other complaint, claim, demand, inquiry, or other notice, including a notice of investigation from any third party or any Governmental Entity regarding the Seller's collection, use, storage, processing, transfer or disclosure of Customer Information or alleging that the Seller's collection, processing, use, storage, security, transfer, and/or disclosure of Customer Data (i) is in violation of any applicable Laws regarding the protection of Customer Data and the security of data, (ii) is in violation of

- 37 -

any Material Contract, (iii) is in violation of any Privacy and Data Security Policies, or (iv) otherwise constitutes an unfair, deceptive, or misleading trade practice

(g)     The execution, delivery, or performance of this Agreement and the consummation of the transactions contemplated under this Agreement will not violate any applicable Privacy Law, Privacy Policies or Privacy Contracts or result in or give rise to any right of termination or other right to impair or limit the Seller's rights to own or use any Personal Information used in or necessary for the conduct of the Business of the Seller.

### Section 4.23.    Underwriting Guidelines: Merchant Accounts

(a)     The standards, procedures, parameters and guidelines that govern the Seller's underwriting are provided by the Service Providers (the "Underwriting Guidelines"). The Seller applies the Underwriting Guidelines consistently across all similarly categorized merchants. The Seller is, and has been, in compliance with, has not circumvented and has acted in good faith with respect to the Underwriting Guidelines.

### Section 4.24.    No Termination/Deregistration.

Neither the Seller nor any of its officers, directors, owners, members, partners or principals, nor any other person performing the Seller's obligations under the Program Standards or other applicable rules, has been deregistered or otherwise terminated by any Service Provider or Association.  The Seller is, and has been, in good standing with the Service Providers and has complied in all material respects with all Service Provider registration requirements.

### Section 4.25.    Disclosure and Cancellation of Service Provider; Association, Merchant and Referral Source Contracts.

(a)     The Seller maintains good relations with each of the Service Providers and to the Seller's Knowledge, no event has occurred that would materially and adversely affect the Seller's relations with any such Service Providers.  None of the Service Providers has ever canceled, terminated or to the Seller's Knowledge, made any threat to: (A) cancel or otherwise terminate its Contract or (B) cancel or otherwise terminate its business relationship with the Seller.

(b)     The Seller maintains good relations with each of the Associations and to the Seller's Knowledge, no event has occurred that would materially and adversely affect the Seller's relations with any such Associations.  None of the Associations has ever canceled, terminated or to the Seller's Knowledge, made any threat to:  (A) cancel or otherwise terminate its Contract or (B) cancel or otherwise terminate its business relationship with the Seller.

(c)     True and correct copies of the form of Contracts entered into with Merchants have been made available to Purchaser in the electronic data room and to the extent that any Contracts entered into with any Merchant vary from the form agreement, such contracts and differences have been noted in Schedule 4.25(c).  The Merchant Contracts have been complied with in all material respects in accordance with their terms by the Seller and, to the Seller's Knowledge, the applicable merchant. The Seller has not received any notice from any merchant that such merchant intends to terminate its Merchant Contract prior to the end of its

- 38 -

term. Each Merchant Contract is currently active and in full force and effect and the performance of the Merchant Contracts by the Seller will not result in any violation of or failure to comply with any material Association Requirement, or any Law, Order or other requirements imposed by any Government Entity. No merchant is a party to a current Merchant Contract for which no written agreement exists.

(d)    Schedule 4.25(d) contains a list for each Merchant account including: (i) the Merchant's name and address and MID; and (ii) its current year-to-date monthly Residuals.

(e)    Schedule 4.25(e) sets forth the names of the top ten (10) sales representatives and/or referral sources (including independent contractors) of the Seller based on consolidated expenses (the "Top Referral Sources"). True and correct copies of all Contracts (and any exhibits, schedules and terms and conditions relating thereto) currently in effect with Top Referral Sources have been made available to Purchaser in the electronic data room. The Seller maintains good relations with each of the Top Referral Sources and no event has occurred to the Seller's Knowledge that would materially and adversely affect the Seller's relations with any such Top Referral Sources. None of the Top Referral Sources has ever canceled, terminated or, to the Seller's Knowledge, made any threat to: (A) cancel or otherwise terminate its Contract or (B) cancel or otherwise terminate its business relationship with the Seller.

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF THE MANAGEMENT TEAM MEMBERS

Each Stockholder hereby represents and warrants to the Purchaser as follows:

**Section 5.1.    Authorization.**

Such Stockholder has full and absolute legal right, capacity, power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by such Stockholder and constitutes the valid and binding agreement of such Stockholder, enforceable against such Stockholder in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

**Section 5.2.    Absence of Restrictions and Conflicts.**

The execution, delivery and performance of this Agreement, the consummation of the transactions contemplated by this Agreement and the fulfillment of and compliance with the terms and conditions of this Agreement do not or will not, as the case may be, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, or permit the acceleration of any obligation under, or otherwise require any action, approval, order, authorization, registration, declaration or filing with respect to (a) any Contract to which such Stockholder is a party, (b) any Order of any Governmental Entity to which such Stockholder is a

- 39 -

party or by which such Stockholder or any of their properties is bound or (c) any Permit, Law or arbitration award of any court or Governmental Entity or agency applicable to such Stockholder, that in any case would be reasonably likely to prevent or materially delay the performance by such Stockholder of any of its obligations under this Agreement or the consummation of any of the transactions contemplated hereby.

### Section 5.3.     <u>Legal Proceedings</u>.

(a)     There are no Proceedings pending or threatened against, relating to or involving such Stockholder or its assets by or before any Governmental Authority.

(b)     There have been no Proceedings that have (i) resulted in any criminal sanctions or (ii) resulted in any payments, in each case by or against such Stockholder (whether as a result of a judgment, civil fine, settlement or otherwise).

### Section 5.4.     <u>No Brokers</u>.

No Stockholder has employed any broker, finder or investment banker or incurred any Liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated by this Agreement.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as follows:

### Section 6.1.     <u>Organization</u>.

The Purchaser is a limited liability company duly formed, validly existing and in good standing under the Laws of Florida. The Purchaser has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

### Section 6.2.     <u>Authorization</u>.

The Purchaser has full limited liability company power and authority to execute and deliver this Agreement and any other certificate, agreement, document or other instrument to be executed and delivered by it in connection with the transactions contemplated by this Agreement (collectively, the "<u>Purchaser Ancillary Documents</u>") and to perform its obligations under this Agreement and the Purchaser Ancillary Documents and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Purchaser Ancillary Documents by the Purchaser, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation of the transactions provided for herein and therein have been duly and validly authorized by all necessary corporate action on the part of the Purchaser. This Agreement and the Purchaser Ancillary Documents have been duly executed and delivered by the Purchaser, and constitute the valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of

- 40 -

creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 6.3.    **Absence of Restrictions and Conflicts.**

The execution, delivery and performance of this Agreement and the Purchaser Ancillary Documents, the consummation of the transactions contemplated by this Agreement and the Purchaser Ancillary Documents and the fulfillment of and compliance with the terms and conditions of this Agreement and the Purchaser Ancillary Documents do not or will not, as the case may be, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, or permit the acceleration of any obligation under, or otherwise require any action, approval, order, authorization, registration, declaration or filing with respect to (a) any term or provision of the charter documents of the Purchaser, (b) any Contract to which the Purchaser is a party, (c) any Order of any Governmental Entity to which the Purchaser is a party or by which the Purchaser or any of their properties is bound or (d) any Permit, Law or arbitration award of any court or Governmental Entity or agency applicable to the Purchaser, that in any case would be reasonably likely to prevent or materially delay the performance by the Purchaser of any of its obligations under this Agreement or the consummation of any of the transactions contemplated hereby.

Section 6.4.    **Brokers, Finders and Investment Bankers.**

Neither the Purchaser, nor any officers, directors nor employees of the Purchaser nor any Affiliate of the Purchaser, has employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated by this Agreement.


# ARTICLE VII
## CERTAIN COVENANTS AND AGREEMENTS

Section 7.1.    **Public Announcements.**

The Purchaser, the Seller and the Stockholders shall consult with one another regarding the timing and content of all announcements regarding any aspect of this Agreement or the transactions contemplated hereby to the financial community, Governmental Entities, employees, customers, payors or the general public and shall use commercially reasonable efforts to agree upon the text of any such announcement prior to its release; provided that the Purchaser and its Affiliates shall be permitted to distribute an announcement containing the general terms of such transaction to their limited partners, advisors, lenders, financing sources, members, prospective investors or other investors. For the avoidance of doubt, nothing contained in this Section 7.1 shall prevent any party from disclosing or describing this Agreement or the transactions contemplated herein to their counsel, accountants and other advisors on an as-needed basis so long as such Persons agree to keep such items confidential.

Section 7.2.    **Consents.**

To the extent that third party consents relating to Assumed Contracts have not been obtained by the Seller as of the Closing, the Seller shall, during the remaining term of such Assumed Contracts (the "Non-Assignable Contracts"), use its commercially reasonable best efforts to (a) obtain the consent of the applicable third party, (b) make the benefit of such Non-Assignable Contracts available to the Purchaser, including appointing the Purchaser to act as the Seller's agent or subcontractor to perform all of the Seller's obligations under such Non-Assignable Contracts, (c) collect and promptly remit to the Purchaser all compensation received by the Seller pursuant to the Non-Assignable Contracts and (d) enforce at the request of the Purchaser and at the expense and for the account of the Purchaser, any rights of the Seller arising from such Non-Assignable Contracts against the other party or parties thereto (including the right to elect or terminate any such Non-Assignable Contracts in accordance with the terms thereof). The Seller will not take any action or suffer any omission which would limit or restrict or terminate the benefits to the Purchaser of such Non-Assignable Contracts. With respect to any such Non-Assignable Contract as to which the necessary approval or consent for the assignment or transfer to the Purchaser is obtained following the Closing, the Seller shall transfer such Non-Assignable Contract to the Purchaser by execution and delivery of an instrument of conveyance reasonably satisfactory to the Purchaser and the Seller within three (3) Business Days following receipt of such approval or consent.

**Section 7.3.**     **Non-Competition; Non-Solicitation.**

(a)     From and after the Closing Date and until the fifth anniversary of the Closing Date (the "Restricted Period"), the Seller and the Stockholders shall not, and shall cause their Affiliates not to (i) directly or indirectly, own, manage, control, participate in, consult with, render services for, or in any manner engage in or represent any business within the United States that is competitive with the Business as such Business is conducted or proposed or planned to be conducted from and after the Closing Date (a "Restricted Business") (ii) enter into the employ of, or render any services to or for (whether as an officer, director, employee, advisor, consultant, contractor, or otherwise) any Person engaged in the Restricted Business (such Person, a "Restricted Person"), (iii) become financially interested in any Restricted Person (other than the Purchaser or any of its Affiliates) in any capacity, including as an investor, partner, equity owner, lender, officer, director, principal, agent or trustee; or (iv) take any measure in preparation of any action described in the foregoing clauses (i) through (iii), in each case of clauses (i) through (iv) of this Section 7.3(a), within the United States.

(b)     During the Restricted Period, the Seller and the Stockholders shall not, and shall cause their Affiliates not to, directly or indirectly through another Person (i) induce or attempt to induce any employee of the Purchaser or an Affiliate thereof to leave the employ of the Purchaser or such Affiliate, as applicable, or engage in any conduct or communications with any employee of the Purchaser or any of its Affiliates that directly or indirectly causes such employee to terminate his employment relationship with the Purchaser or such Affiliate; (ii) hire any person who was an employee of the Purchaser or an Affiliate thereof unless one (1) year has elapsed since the termination of such individual's employment relationship with the Purchaser or such Affiliate or (iii) induce or attempt to induce any current or prospective customer, supplier, payment processor, merchant (including Merchants comprising the Seller Residual Portfolio), association, distributor, payor, vendor, developer, service provider, licensor or licensee, independent sales agent, software vendor or partner, sponsor bank or other business relation of

- 42 -

the Purchaser or any Affiliate thereof to cease doing business or reduce its business with the Purchaser or such Affiliate, or in any way interfere with the relationship between any such customer, supplier, payment processor, association, distributor, payor, vendor, developer, service provider, licensor or licensee, independent sales agent, software vendor or partner, sponsor bank or other business relation, on the one hand, and the Purchaser or such Affiliate, on the other hand.

(c)     The Seller and the Stockholders have carefully considered the nature and extent of the restrictions placed upon them by this Agreement, and hereby acknowledge and agree that the same are reasonable in time, scope and territory are reasonable and necessary for the protection of the parties and are an essential inducement to the parties hereto consummating the transactions contemplated by this Agreement.

(d)     The Seller and the Stockholders acknowledge that the Purchaser is providing substantial consideration for the goodwill of the Business and that the restrictions herein are necessary and reasonable for the protection of the value of that goodwill.  Such restrictions are necessary and reasonable for the protection of the trade secrets, valuable confidential business and professional information of the Business and the Business' relationships with specific prospective or existing customers, suppliers, vendors or licensees based on the goodwill of the Business.

(e)     The Seller and the Stockholders recognize and agree that the restrictions herein supersede and control over any prior restrictive covenants between the parties hereto, and also consent and agree that the restrictions herein shall be enforceable by any successors or assigns of any party hereto.

(f)     The Seller and the Stockholders understand and agree that the restrictions contained herein are essential elements to this Agreement, and that without such restrictions the parties would not enter into this Agreement.

(g)     If, at the time of enforcement of this Section 7.3, a court or arbitrator holds that the restrictions stated herein are unenforceable under the circumstances then existing, the court or arbitrator shall modify such restrictions so as to be enforceable; it is the parties' intent that these restrictions shall be enforced to the maximum extent permitted by Law.

(h)     The Seller and the Stockholders covenant and agree that they will not seek to challenge the enforceability of the covenants contained in this Section 7.3 against any of the Purchaser or any of its Affiliates, nor will any of the Seller or Stockholders assert as a defense to any action seeking enforcement of the provisions contained in this Section 7.3 (including an action seeking injunctive relief) that such provisions are not enforceable due to lack of sufficient consideration received by such party.  The parties hereto agree and acknowledge that money damages would be an inadequate remedy for any breach of this Section 7.3.  Therefore, in the event of a breach or threatened breach by any party of this Section 7.3, the non-breaching party or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions of this Section 7.3 (without posting a bond or other security).  Upon any such application, the applying party, its subsidiaries,

- 43 -

or their successors or assigns, shall be entitled to reasonable attorneys' fees and costs in bringing such action should it be the prevailing party.

### Section 7.4.      **Collection of Accounts.**

(a)      If, after the Closing, the Seller receives any payment on any accounts receivables acquired by Purchaser hereunder, the Seller shall forward such payment to the Purchaser within five (5) business days after the Seller's receipt thereof, together with an assignment permitting the Purchaser to collect on such accounts receivable. Effective as of the Closing, the Seller hereby appoints the Purchaser as its agent and attorney-in-fact solely to collect all receivables acquired by the Purchaser hereunder and to endorse, in the name of the Seller, any checks or other instruments of payment received on account of payment of such receivables.

(b)      Subject to Section 10.3(c), if, after the Closing, the Purchaser receives any payment in respect of December 2016 Future Residuals payable in January 2017, the Purchaser shall forward such payment to the Seller within five (5) Business Days after Purchaser's receipt thereof. If, after the Closing, the Purchaser receives any security deposit with respect to the Leased Real Property, the Purchaser shall forward such payment to the Seller within five (5) Business Days after the Purchaser's receipt thereof.

### Section 7.5.      **After-Acquired Assets.** The Seller and Stockholders shall assign, transfer and deliver to the Purchaser all assets, properties, rights and interests of whatever kind and nature, real and personal, tangible and intangible, included within the definition of Assets relating to the Business and received, held or acquired by the Seller or any Stockholder from and after the Closing Date.

### Section 7.6.      **Change in Name.** Within thirty (30) days after the Closing Date, the Seller shall, and shall cause its Affiliates to (if necessary), amend its certificate or articles of organizational or formation or other similar organizational documents to change its legal name to a name that does not include the words "United Payment Services" or any variation thereof. From and after the Closing, neither the Seller nor any of its Affiliates shall use the "United Payment Services" name or any name of any predecessor entity to the Seller or any variation thereof in any commercial enterprise or endeavor except for use thereof in the business conducted by Purchaser or its Affiliates. Notwithstanding the foregoing, any payments due to Seller shall be paid to Seller as newly named.

### Section 7.7.      **No Voluntary Dissolution; Preservation of Records.**

(a)      For a period of three (3) years following the Closing (the "Continuation Period"), the Seller shall not take any action to voluntarily enter into bankruptcy, liquidation or any similar Proceeding or take, or cause to be taken, any other action which would result in the dissolution of the Seller. Notwithstanding the foregoing, in the event one or more indemnification claims is made pursuant to Article X hereof during the Continuation Period, the Seller agrees not to take any such actions to voluntarily enter into bankruptcy, liquidation or any similar Proceeding or take, or cause to be taken, any other action which would result in the dissolution of the Seller until such time as such claim or claims are finally resolved.

- 44 -

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 53 of 104

(b)     In order to facilitate the resolution of any claims made by or against the Purchaser or the Seller relating to the Business, for a period of seven (7) years after the Closing Date (or such longer period as may be required by Law), each of Purchaser and the Seller shall (a) retain the books and records relating to the Assets or Assumed Liabilities over which it has control, to the extent such books and records relate to the ownership or operation of the Assets or Assumed Liabilities prior to the Closing Date, and (b) upon reasonable advance notice and during normal business hours, afford the Purchaser or the Seller, as applicable, and their officers, employees, agents and representatives reasonable access (including the right to make photocopies, at such other party's expense) to such books and records for any reasonable purpose; provided, however, that any such access shall not unreasonably disrupt the normal operations of the Purchaser or the Seller, as applicable.  Notwithstanding the foregoing, if any party shall desire to dispose of any such books and records prior to the expiration of the seven-year anniversary of the Closing Date, such party shall, prior to such disposition, give the Purchaser or the Seller, as applicable, a reasonable opportunity, at its expense, to copy such books and records in accordance with this Section 7.7(b).

### Section 7.8.      **Employees.**

(a)     At the Purchaser's sole discretion, the Purchaser may offer employment, on an "at will" basis, to any or all employees of the Seller engaged in the Business.  The Seller shall immediately terminate all employees of the Seller who accept employment with the Purchaser.  Each such employee of the Business who accepts the Purchaser's offer of employment is referred to herein as a "Transferred Employee."  For purposes of clarification, the Purchaser shall not be required to offer employment to any employee of the Seller.

(b)     The Seller shall be solely responsible and the Purchaser shall have no obligations whatsoever for any compensation or other amounts payable to any current or former employee, independent contractor, consultant or Leased Worker of the Seller, (or any of their eligible dependents) aside from any such obligations that arise in connection with services rendered to the Purchaser by the Transferred Employees after the Closing, including, without limitation, bonus, salary, accrued vacations, fringe, pension or profit sharing benefits, employee benefits or severance pay payable to any such employees, independent contractors, consultants or Leased Workers of the Seller, or any of their eligible dependents (whether or not provided through a Company Benefit Plan or other employee benefits) relating to service with the Seller at any time, whether prior to, on or after the Closing Date and whether or not such obligations arise in connection with the transaction contemplated hereby.  The Seller shall be solely responsible and the Purchaser shall have no obligations whatsoever for any such amounts payable to (i) any Transferred Employee relating to such Transferred Employee's service with the Seller at any time or for any period prior to or on the Closing Date or (ii) any other employee of the Seller who does not receive or rejects an offer of employment from the Purchaser.

(c)     The Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health, accident or disability benefits (whether or not provided through a Company Benefit Plan or other employee benefits) brought by or in respect of any current or former employees, independent contractors, consultants or Leased Workers of the Seller (or any of their eligible dependents) pursuant to a Company Benefit Plan, whether such claims are incurred prior to, on or after the Closing Date.  The Seller also shall remain solely

- 45 -

responsible for all workers' compensation claims of any current or former employees, independent contractors, consultants or Leased Workers of the Seller (or any of their eligible dependents) which relate to such individuals' (or their eligible dependents') service with the Seller. The Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)     Within ten (10) Business Days following (or sooner to the extent required by applicable Law) the Closing Date, the Seller shall pay to each Transferred Employee any and all amounts necessary to satisfy such Transferred Employee's (i) accrued and unused vacation time and (ii) annual cash bonus (based on performance as of the Closing Date) and/or commissions earned for the period beginning on the first day of the performance period for such bonus or commissions through the Closing Date, irrespective of whether such amount is due and payable as of such time in the ordinary course under the applicable plan, program or agreement for such vacation time, bonus or commissions (in each of (i) and (ii) above, to the extent not set forth on Section 2.4(b)).

(e)     The Seller hereby assigns to the Purchaser all of its rights and interests in any confidentiality, non-solicitation of clients or customers, non-solicitation of employees or consultants, non-interference, non-competition, non-disparagement or similar agreement (existing and in effect as of the date hereof) between the Seller, on the one hand, and each Transferred Employee, on the other hand, to the extent such rights and interests protect the interest of the Business and to the extent such assignment is permitted under applicable Law and under the terms of such agreement.

(f)     Following the Closing, the parties shall reasonably cooperate in all matters reasonably necessary to effect the transfer of employment of the Transferred Employees.

(g)     The Seller shall be solely responsible and liable for providing continuing benefits or coverage for any participant or beneficiary of a participant who is or becomes a "qualified beneficiary" (as defined for purposes of COBRA) prior to, on or after the Closing Date under any Company Benefit Plan that as of the Closing Date is subject to the requirements of COBRA, or mandated by other applicable Laws, including state Law, whether such obligation to provide continuing benefits or coverage under any such Company Benefit Plan arises prior to, on or after the Closing Date. In the event that the Purchaser becomes obligated through operation of law to provide COBRA continuation coverage to any such qualified beneficiaries, the Seller shall jointly and severally indemnify and reimburse the Purchaser for any amounts or benefits that are required to be paid to such qualified beneficiaries who are eligible for and elect to participate in COBRA coverage under the welfare benefit plans of the Purchaser or its Affiliates that are in excess of the COBRA premiums collected from such qualified beneficiaries.

### Section 7.9.     **Confidentiality.**

(a)     At Closing, the obligations of the Purchaser and its Affiliates under the Confidentiality Agreement shall terminate with respect to information relating solely to the Assets and/or the Assumed Liabilities.

- 46 -

(b)      Neither any party nor any of their respective Affiliates, employees, agents and Representatives shall reveal or disclose to any Person any Confidential Information concerning the business or affairs of any other party that it may have acquired from such party in the course of pursuing the transactions contemplated hereby without the prior written consent of such party, other than, with respect to the Purchaser, with respect to Confidential Information relating solely to the Assets and/or the Assumed Liabilities.

(c)      Neither the Seller nor any of its Affiliates, employees, agents or Representatives will disclose to any Person any Confidential Information concerning the Business that the Seller or its respective Affiliates, employees, agents or Representatives acquired during its operation of the Business.

(d)      Notwithstanding the foregoing, any party may disclose any such Confidential Information as follows: (i) to such party's Affiliates and its or its Affiliates' employees, lenders, counsel or accountants, the actions for which the applicable party will be responsible; (ii) to comply with any applicable Law or Order, provided that prior to making any such disclosure, the party making the disclosure notifies the other party of any Proceeding of which it is aware which may result in disclosure and uses commercially reasonable efforts to limit or prevent such disclosure; (iii) to the extent that the Confidential Information is or becomes generally available to the public through no fault of the party or its Affiliates making such disclosure; (iv) to the extent that the same information is in the possession (on a non-confidential basis) of the party making such disclosure prior to receipt of such Confidential Information; or (v) to the extent that the same information becomes available to the party making such disclosure on a non-confidential basis from a source other than a party or its Affiliates, which source, to the disclosing party's Knowledge, is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation to the other party.

**Section 7.10.      Disclosure of Referral Source.**

Within one (1) Business Day following the Closing, the Seller shall disclose to Purchaser the identity of, and provide copies of true, correct and complete agreements with, its major referral source that has not been identified in the Schedules or previously disclosed to the Purchaser.

## ARTICLE VIII
## TAX MATTERS

**Section 8.1.      Tax Cooperation.**

The Seller and the Purchaser shall reasonably cooperate with each other in connection with the preparation or audit of any Tax Return(s) and any Tax claim or litigation in respect of the Business and the Assets, which cooperation shall include, but not be limited to, making reasonably available documents and employees, if any, capable of providing information or testimony, including, without limitation, the Books and Records. The party requesting assistance hereunder shall reimburse the assisting party for reasonable out-of-pocket expenses incurred in providing assistance. The Purchaser and the Seller will retain for the full period of any statute of

- 47 -

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 56 of 104

limitations and provide the others with any records or information which may be relevant to such preparation, audit, examination, proceeding or determination.

### Section 8.2.      **Transfer Taxes**.

All excise, sales, use, value added, registration stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and fees incurred in a Pre-Closing Tax Period, Post-Closing Tax Period or Straddle Period in connection with the sale of the Business and the Assets, as contemplated by this Agreement (collectively, "Transfer Taxes"), shall be borne by the Seller.  The Purchaser and the Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.  The party that is required by applicable Law to make the filings, reports, or returns with respect to any applicable Transfer Taxes shall do so on a timely basis, and the other party shall cooperate with respect thereto as necessary.

### Section 8.3.      **Apportionment of Taxes**.

(a)      The Seller shall timely pay all Taxes that are Excluded Liabilities.

(b)      All Taxes (including property Taxes and ad valorem Taxes) for a taxable period which includes (but does not end on) the Closing Date (a "Straddle Period"), shall be apportioned between the portion of the period ending on the Closing Date and to a portion of the Straddle Period beginning on the day after the Closing Date based upon the number of days in the taxable period before and after the Closing Date.  Notwithstanding the foregoing, all Taxes based on income, receipts and payments shall be apportioned to the Straddle Period ending on the Closing Date and the portion of the Straddle Period beginning after the Closing Date based on a "closing of the books" methodology.

### Section 8.4.      **Tax Claims**.

(a)      After the Closing, the Seller and the Purchaser shall promptly notify the other party in writing upon receipt of any written notice of any pending or threatened audit or assessment, suit, proposed adjustment, deficiency, dispute or judicial Proceeding or similar claim relating to Taxes (a "Tax Claim") with respect to Losses for which the other Party could be liable pursuant to this Agreement; and

(b)      The Seller shall have a right to control, at its own cost, without affecting its or any other party's rights to indemnification under this Agreement, the defense of all Tax Claims relating to Taxes of the Seller. The Purchaser shall control any audits or other Proceedings relating to Taxes of the Purchaser (or Taxes related to the Assets or any employees of the Seller who accept employment with the Purchaser in accordance with Section 7.8).  To the extent that any audit or other Proceeding that the Seller controls could affect any Tax or Tax Return of the Purchaser, the Seller shall keep the Purchaser reasonably informed regarding the status of such claim and allow the Purchaser to participate in such audit or other Proceeding.

- 48 -

**ARTICLE IX**
**CLOSING**

**Section 9.1.    Closing.**

The consummation of the transactions contemplated by this Agreement are referred to in this Agreement as the "Closing." The "Closing Date" will occur on the date hereof, or on such other date as the parties may agree. The Closing will take place at the offices of Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166, or at such other place (and by such other method, including facsimile and other means of electronic transmission (including .pdf files)) as the parties may agree.

**Section 9.2.    Deliveries by the Seller.**

At the Closing, the Seller and/or the Stockholders, as applicable, shall deliver or cause to be delivered to Purchaser:

(a)    duly executed copies of all consents and approvals (including, without limitations, those consents and approvals set forth on Schedule 9.2(a)), in form and substance reasonably satisfactory to the Purchaser and its counsel, that are required for consummation of the transactions contemplated by this Agreement and the Related Documents;

(b)    to the extent any of the Assets are encumbered (other than Permitted Liens), releases of such Liens.

(c)    duly executed deeds, bills of sale, instruments of assignment, certificates of title and other conveyance documents, dated as of the Closing Date, transferring to the Purchaser all of the Seller's right, title and interest in and to the Assets, together with possession of the Assets, including a bill of sale (the "Bill of Sale");

(d)    documents evidencing the assignment of the Assumed Contracts and the assignment of any Permits and Intellectual Property, including an assignment and assumption agreement (the "Assignment and Assumption Agreement");

(e)    certificates, dated as of the Closing Date, signed by the Secretary of the Seller, certifying as to (i) the Seller's organizational documents and the incumbency of its officers executing this Agreement and the Seller Ancillary Agreement to which it is a party and (ii) the resolutions of the members or board of managers or comparable governing body of the Seller authorizing the execution, delivery and performance by the Seller of this Agreement and the Seller Ancillary Agreement to which it is a party;

(f)    a certificate of the Secretary of State (or other applicable office) in which the Seller is organized and qualified to do business, dated as of a date not more than thirty (30) Business Days prior to the Closing Date, certifying as to the good standing status of the Seller;

(g)    certificates, duly completed and executed by the Seller (or if the Seller is a disregarded entity, by its appropriate owner) and in the form provided for in Treasury Regulation

- 49 -

Section 1.1445-2, certifying that the Seller (or if the Seller is a disregard entity, its appropriate owner) is not a "foreign person" within the meaning of Section 1445 of the Code;

(h)    all other documents required to be entered into by the Seller pursuant to this Agreement or reasonably requested by the Purchaser to convey the Assets to the Purchaser or to otherwise consummate the transactions contemplated by this Agreement.

**Section 9.3.    Deliveries by the Purchaser.**

At the Closing, the Purchaser shall deliver or cause to be delivered to the Seller:

(a)    certificates, dated as of the Closing Date, signed by the Secretary of the Purchaser, certifying as to (i) Purchaser's organizational documents and the incumbency of its officers executing this Agreement and each Purchaser Ancillary Agreement to which it is a party and (ii) the resolutions of the board of directors of the Purchaser authorizing the execution, delivery and performance by the Purchaser of this Agreement and each Purchaser Ancillary Agreement to which it is a party; and

(b)    all other documents required to be entered into or delivered by the Purchaser at or prior to the Closing pursuant to this Agreement or the Purchaser Ancillary Documents.

**ARTICLE X**
**INDEMNIFICATION**

**Section 10.1.    Indemnification Generally.**

(a)    By the Seller and Stockholders in Favor of the Purchaser Indemnified Parties.  The Seller and Stockholders agree, jointly and severally, subject to the provisions set forth in this Article X, to indemnify, defend and hold harmless each member of the Purchaser Indemnified Parties for any and all Losses they may suffer, sustain or incur arising from, in connection with, or as a result of (without duplication):

(i)    the inaccuracy or breach of any representation or warranty (without regard to any qualification as to "materiality" or "Material Adverse Effect" contained therein) of the Seller or Stockholders contained in this Agreement;

(ii)    the breach of any agreement or covenant of the Seller or Stockholders contained in this Agreement;

(iii)    any Excluded Asset or Excluded Liability;

(iv)    all Excluded Taxes and all Transfer Taxes;

(v)    matters required to be set forth on Schedule 4.9; or

(vi)    any fraud, willful misconduct or bad faith of the Seller in connection with this Agreement or the Related Documents.

- 50 -

(b)     By Purchaser in Favor of the Seller Indemnified Parties.  Purchaser agrees, subject to the provisions set forth in this Article X, to indemnify, defend and hold harmless each member of the Seller Indemnified Parties for any and all Losses they may suffer, sustain or incur arising from, in connection with, or as a result of (without duplication):

(i)     the inaccuracy or breach of any representation or warranty (without regard to any qualification as to "materiality" or "Material Adverse Effect" contained therein) of the Purchaser contained in this Agreement;

(ii)    the breach of any agreement or covenant of Purchaser contained in this Agreement;

(iii)   any fraud, willful misconduct or bad faith of the Purchaser in connection with this Agreement or the Purchaser Ancillary Documents; or

(iv)    any Assumed Liability.

**Section 10.2.     Indemnity Cap for the Seller Indemnified Parties.**

Subject to Section 10.2(c), the sum of all Losses pursuant to which indemnification is payable by the Seller and Stockholders pursuant to Section 10.1(a)(i) for breaches of representations and warranties shall not exceed, in the aggregate, the Purchase Price actually paid hereunder (the "Cap Amount"). The sum of all Losses pursuant to which indemnification is payable by the Purchaser pursuant to Section 10.1(b)(i) shall not exceed, in the aggregate, the Cap Amount.

**Section 10.3.     Assertion of Claims; Payment of Claims; Right of Setoff.**

(a)     No claim shall be brought under Section 10.1 unless the Indemnified Persons, or any of them, give the Indemnifying Persons written notice of the existence of any such claim, specifying the nature and basis of such claim and the amount thereof, to the extent known.  Upon the giving of such written notice as aforesaid, the Indemnified Persons, or any of them, shall have the right to commence legal Proceedings for the enforcement of their rights under Section 10.1.

(b)     Subject to Section 10.3(c), a determination of Liability under this Article X, the Indemnifying Persons shall pay the Indemnified Persons the amount so determined within five (5) Business Days after the date of determination. If there should be a dispute as to the amount or manner of determination of any indemnity obligation owed under this Agreement, the Indemnifying Persons shall nevertheless pay when due such portion, if any, of the obligation as shall not be subject to dispute.

(c)     Any obligation of the Seller to indemnify the Purchaser Indemnified Parties for Losses hereunder shall be satisfied, in cash from the Seller or Stockholders, jointly and severally, at the option of the Purchaser (x) by prompt payment to the appropriate member of the Purchaser Indemnified Parties, or (y) by set-off against any payments payable to Seller or Stockholders under this agreement, including payments payable under Section 3.2(b)(i), Section 3.2(b)(ii) or Section 7.4(b).

- 51 -

(d)     The obligations of the Seller and Stockholders to indemnify the Purchaser Indemnified Parties pursuant to the terms of this Agreement are the primary obligations of the Seller and Stockholders, subject to the limitations set forth herein.

**Section 10.4.     Survival of Representations and Warranties.**

(a)     The representations and warranties, covenants and other agreements of the Seller, the Stockholders and the Purchaser contained in this Agreement shall survive the Closing Date.

(b)     Each party hereto shall be entitled to rely upon, and shall be deemed to have relied upon, all representations, warranties and covenants of each other party set forth in this Agreement which have been or are made in favor of such party, and the rights of the Purchaser Indemnified Parties under this Article X shall not be affected notwithstanding (i) the making of this Agreement or (ii) any investigation or examination conducted with respect to, or any Knowledge acquired (or capable of being acquired) about the accuracy or inaccuracy of or compliance with, any representation, warranty, covenant, agreement, undertaking or obligation made by or on behalf of the parties hereto.

**Section 10.5.     Effect of Investigation**

The representations, warranties and covenants of the Seller Indemnifying Parties and the Purchaser Indemnifying Parties' right to indemnification with respect hereto shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Purchaser Indemnified Parties (including by any of their Representatives) or by reason of the fact that any Purchaser Indemnified Party knew or should have known that any such representation or warranty is, was, or might be inaccurate or by reason of the Purchaser Indemnified Parties' waiver of any condition set forth in Article IX.

**Section 10.6.  Purchase Price Adjustment.**

The Purchaser and the Seller agree that any indemnity payment made under this Agreement shall, to the extent permitted by Law, be treated by the parties hereto as an adjustment to the Purchase Price.

**ARTICLE XI**
**MISCELLANEOUS PROVISIONS**

**Section 11.1.     Remedies.**

The parties hereto shall each have and retain all rights and remedies existing in their favor under this Agreement, at Law or equity, including, without limitation, rights to bring actions for specific performance and/or injunctive or other equitable relief (including, without limitation, the remedy of rescission) to enforce or prevent a breach or violation of any provision of this Agreement. All such rights and remedies shall, to the extent permitted by applicable Law, be cumulative and the existence, assertion, pursuit or exercise of any thereof by a party shall not preclude such party from exercising or pursuing any other rights or remedies available to it.

- 52 -

### Section 11.2.     Notices.

All notices, communications and deliveries under this Agreement will be made in writing signed by or on behalf of the party making the same, will specify the Section under this Agreement pursuant to which it is given or being made, and will be delivered personally or by facsimile or other electronic transmission or sent by registered or certified mail (return receipt requested) or by next day courier (with evidence of delivery and postage and other fees prepaid) as follows:

To the Purchaser:

> Direct Connect Merchant Services, LLC
> 3901 Centerview Drive, Suite W
> Chantilly, VA 20151
> Attention: Matt Clyne
> Telephone: (800) 747-6273
> Facsimile: (732) 753-6005
>
> with a copy (which shall not constitute notice) to:
>
> Winston & Strawn LLP
> 200 Park Avenue
> New York, NY 10166
> Attention: Bryan C. Goldstein, Esq.
> Telephone:   (212) 294-6668
> Facsimile: (212) 294-4700

To the Seller or any Stockholder, to the Seller:

> United Payment Services
> 5080 Wagner Way
> Oak Park, CA 91377
> Attention:  Scott Rosen
> Telephone: (805) 660-2163

with a copy (which shall not constitute notice) to:

> Craig Rosen
> 1033 Via Anita
> Newbury Park, CA 91320
> Telephone: 805-262-7007

or to such other representative or at such other address of a party as such party may furnish to the other parties in writing.  Any notice which is delivered personally or by facsimile or other electronic transmission in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party or its agent.  Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to

- 53 -

have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the fourth Business Day after the day it is so placed in the mail (or on the first Business Day after placed in the mail if sent by overnight courier) or, if earlier, the time of actual receipt.

### Section 11.3.  Schedules and Exhibits.

The Disclosure Schedules and Exhibits to this Agreement are hereby incorporated into this Agreement and are hereby made a part of this Agreement as if set out in full in this Agreement.

### Section 11.4.  Assignment; Successors in Interest.

No assignment or transfer by any party of such party's rights and obligations under this Agreement will be made except with the prior written consent of the other parties to this Agreement; *provided*, *however*, that the Purchaser may assign any or all of its rights, obligations and interests hereunder without any such written consent to any Affiliate of the Purchaser (including, without limitation, the right to acquire any of the Assets) or to any of the Purchaser's lenders as security for any obligations arising in connection with the financing of the transactions contemplated hereby.  This Agreement will be binding upon and will inure to the benefit of the parties and their successors and permitted assigns, and any reference to a party will also be a reference to a successor or permitted assign.

### Section 11.5.  Number; Gender.

Whenever the context so requires, the singular number will include the plural and the plural will include the singular, and the gender of any pronoun will include the other genders.

### Section 11.6.  Captions.

The titles, captions and table of contents contained in this Agreement are inserted in this Agreement only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.  Unless otherwise specified to the contrary, all references to Articles and Sections are references to Articles and Sections of this Agreement and all references to Schedules or Exhibits are references to Schedules and Exhibits, respectively, to this Agreement.

### Section 11.7.  Controlling Law.

This Agreement will be governed by and construed and enforced in accordance with the internal laws of the State of New York without reference to its choice of law rules.

### Section 11.8.  Consent to Jurisdiction, Etc.

Except as otherwise expressly provided in this Agreement, the parties hereto agree that any and all suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought only to the exclusive jurisdiction of the courts of the State of New York located

- 54 -

in New York County or the federal courts located in New York County, and each of the parties hereby consents to the jurisdiction of such courts in any such suit, action or proceeding. The parties hereto irrevocably waive, to the fullest extent permitted by Law, any objection which they may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. The parties agree that, after a legal dispute is before a court as specified in this Section 11.8, and during the pendency of such dispute before such court, all actions, suits, or proceedings with respect to such dispute or any other dispute, including without limitation, any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each of the parties consents to the service of any complaint, summons, notice or other process relating to any such action or proceeding by delivery thereof to such party by hand or by certified mail, delivered or addressed as set forth in Section 11.2 hereof.

**Section 11.9.    WAIVER OF JURY TRIAL.**

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.10.    Severability.**

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by Law, the parties waive any provision of Law which renders any such provision prohibited or unenforceable in any respect.

**Section 11.11.    Counterparts and Electronic Delivery.**

This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, and it will not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one (1) of such counterparts. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile or other means of electronic transmission (including .pdf files) pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.

**Section 11.12.    Enforcement of Certain Rights.**

Nothing expressed or implied in this Agreement is intended, or will be construed, to confer upon or give any Person other than the parties, and their successors or permitted assigns, any rights, remedies or Liabilities under or by reason of this Agreement, or result in such Person being deemed a third party beneficiary of this Agreement.

- 55 -

### Section 11.13.    Amendment/Waiver.

No provision of this Agreement shall be modified, amended, extended, supplemented, discharged, terminated or waived except by a writing specifically referring thereto, signed by all of the parties hereto and delivered by all parties to the other parties. A waiver by a party of the performance of any covenant, agreement, obligation, condition, representation or warranty will not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty. A waiver by a party of a condition to Closing will not be considered as a waiver of any rights to indemnification that may be claimed by such party with respect to the matters relating to such waived condition.  A waiver by any party of the performance of any act will not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

### Section 11.14.    Integration.

This Agreement and the documents executed pursuant to this Agreement supersede all negotiations, agreements and understandings (both written and oral) among the parties with respect to the subject matter of this Agreement.

### Section 11.15.    Cooperation Following the Closing.

Following the Closing, each of the parties shall deliver to the others such further information and documents and shall execute and deliver to the others such further instruments and agreements as the other party shall reasonably request to consummate or confirm the transactions provided for in this Agreement, to accomplish the purpose of this Agreement or to assure to the other party the benefits of this Agreement.

### Section 11.16.    Transaction Costs.

Except as provided above or as otherwise expressly provided herein, (a) the Purchaser will pay its own fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees, costs and expenses of its financial advisors, accountants and counsel; provided, that the Purchaser will pay $12,500 with respect to the assignment and assumption fee payable under the FDMS Agreement; and (b) the Seller will pay the fees, costs and expenses of the Seller and the Stockholders incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees, costs and expenses of its financial advisors, accountants and counsel, and the remainder of the assignment and assumption fee payable under the FDMS Agreement.

### Section 11.17.    Interpretation; Construction.

(a)    The term "Agreement" means this agreement together with all Schedules, Annexes and Exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof.  Unless the context otherwise requires, words importing the singular shall include the plural, and vice versa.  The use in this Agreement of the term "including" means "including, without limitation." The words "herein", "hereof", "hereunder", "hereby", "hereto", "hereinafter", and other words of similar import refer to this Agreement as a whole, including the Schedules, Annexes and Exhibits, as the same may

- 56 -

from time to time be amended, modified, supplemented or restated, and not to any particular article, section, subsection, paragraph, subparagraph or clause contained in this Agreement. All references to articles, sections, subsections, clauses, paragraphs, schedules and exhibits mean such provisions of this Agreement and the Schedules, Annexes and Exhibits attached to this Agreement, except where otherwise stated. The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require. The use in this Agreement of the terms "furnished," "provided," "delivered," "made available" and similar terms refers, with respect to the provision of information and documents to the Purchaser, in addition to the physical delivery of such information or documents to the Purchaser, to such information and/or documents as are made available by the Seller or any of their respective employees, consultants, advisors or attorneys.

(b)     The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party. Any fact or item disclosed on any Schedule to this Agreement shall be deemed disclosed on all other Schedules to this Agreement to which such fact or item may reasonably apply so long as such disclosure is in sufficient detail to enable a party hereto to identify the facts or items to which it applies. Any fact or item disclosed on any Schedule hereto shall not by reason only of such inclusion be deemed to be material and shall not be employed as a point of reference in determining any standard of materiality under this Agreement.

(c)     The Seller and the Stockholders hereby acknowledge and agree that (i) it has had the opportunity to consult with its own counsel with respect to the subject matter of this Agreement, and has read and understands all of the provisions of this Agreement (including the Schedules and Exhibits to this Agreement), and (ii) it has had the opportunity to ask questions of, and to seek additional information from, the Purchaser with respect to each of the matters set forth in this Agreement (including the Schedules and Exhibits to this Agreement).

[Remainder of page intentionally left blank]

- 57 -

      **IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed, as of the date first above written.

                    **SELLER**

                    **UNITED PAYMENT SERVICES, INC.**

                    By: _____
                    Name:
                    Title:

                    **STOCKHOLDERS**

                    _____
                    SCOTT ROSEN

                    _____
                    CRAIG ROSEN

                    **PURCHASER**

                    **DIRECT CONNECT MERCHANT SERVICES, LLC**

                    By: _____
                    Name:
                    Title:

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed, as of the date first above written.

**SELLER**

**UNITED PAYMENT SERVICES, INC.**

By:

Name: Scott Rosen

Title: President

**STOCKHOLDERS**

SCOTT ROSEN

CRAIG ROSEN

**PURCHASER:**

**DIRECT CONNECT MERCHANT SERVICES, LLC**

By: _____
Name: Kevin Gates
Title: Chief Financial Officer

[Signature Page to Asset Purchase Agreement]

**Exhibit A**

**Wire Instructions**

Bank: Pacific Western Bank, 32111 Agoura Road, Westlake Village, CA 91361
Routing Number: 122238200
Account Number: 002020688

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 70 of 104

**DISCLOSURE SCHEDULES**

**to the**

**ASSET PURCHASE AGREEMENT**

**by and among**

**UNITED PAYMENT SERVICES, INC.,**

**SCOTT ROSEN AND CRAIG ROSEN**

**AND**

**DIRECT CONNECT MERCHANT SERVICES, LLC**

**Dated as of January 6, 2017**

1

**Schedule 2.2(c)**
**Assumed Contracts**

**FDMS Agreemnet**

**Authorize.Net Agreement**

**eProcessing Agreement**

2

**Schedule 2.3(b)**
**Excluded Contracts**

Newbury Lease

**Schedule 4.1(a)**
**Trade Names and Fictitious Business Names**

United Payment Services, Inc.

4

**Schedule 4.1(b)**
**Equity Interests**

Total authorized shares: 1,000,000.

Scott Rosen: 750,000 shares.

Craig Rosen: 250,000 shares.

5

**Schedule 4.1(c)**
**Third-Party Equity Interests**

None.

**Schedule 4.4(a)**
**Real Property**

That certain Lease Agreement, dated as of May 23, 2012, by and between Newbury Business Park, LLC, as Lessor, and Scott Rosen, as Lessee, as amended by that certain First Amendment To Lease Extending Lease Term, dated as of May 22, 2014, that certain Second Amendment To Lease Extending Lease Term, dated as of July 30, 2015, and that certain Third Amendment To Lease Extending Lease Term, dated as of September 2, 2016, (the "**Newbury Lease**") for the premises located at 3537 Old Conejo Road, Suites 113 and 114, Newbury Park, CA 91320.

7

**Schedule 4.5(c)**
**Material Personal Property**

None.

**Schedule 4.6**
**Financial Statements**

See attached.

9

**Schedule 4.7**
**Undisclosed Liabilities**

None.

10

**Schedule 4.8**
**Certain Developments**

(a)

None.

(b)

None.

(c)

None.

(d)

None.

(e)

None.

(f)

None.

(g)

None.

(h)

None.

(i)

None.

(j)

None.

(k)

*None.*

(l)

None.

(m)

None.

(n)

11

None.

(o)

None.

**Schedule 4.9**
**Legal Proceedings**

None.

13

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 83 of 104

## Schedule 4.11(a)

## Material Contracts

(i)

None.

(ii)

The Newbury Lease.

(iii)

None.

(iv)

None.

(v)

Kari Gibson – 20% residual - $70/ deal.

(vi)

That certain Merchant Services Sales Agent Agreement, dated as of February 9, 2012, by and between John Nauta Jr., as Agent, and United Payment Services, Inc.

(vii)

That certain Employee Health Plan, provided by Blue Cross Blue Shield of California, for United Payment Services, Inc., with Group ID W0049827, renewed as of December 1, 2015 (the "**BCBS Plan**").

That certain Commercial General Liability Coverage and Businessowners Property Coverage Insurance Policy, provided by Travelers Property Casualty Company of America, for United Payment Services, Inc., with Policy Number 680-8620R956-16-42, issued as of July 7, 2016 and effective through August 21, 2017 (the "**Travelers Plan**").

That certain Workers' Compensation Insurance Policy, provided by Sequoia Insurance Company, for United Payment Services, Inc., with Policy Number QWC1030466, issued as of August 21, 2016 and effective through August 21, 2017 (the "**Sequoia Plan**").

(viii)

None.

(ix)

None.

(x)

14

None.

(xi)

The FDMS Agreement

(xii)

None.

(xiii)

None.

(xiv)

None

(xv)

None

(xvi)

The FDMS Agreement.

That certain Reseller Agreement, dated as of September 2, 2014, by and between Authorize.Net and United Payment Services, Inc. ("**Authorize.Net Agreement**")

That certain Product Agreement, dated as of July 10, 2005, by and between APRIVA, LLC and United Payment Services, Inc.

That certain eProcessing Network Reseller Agreement, dated as of November 19, 2012, by and between eProcessing Network and United Payment Services, Inc. ("**eProcessing Agreement**")

That certain Reseller Agreement, dated as of November 10, 2010, by and between ROAM Data, Inc., and United Payment Services, Inc.

That certain USAePay Reseller Agreement, dated as of April 3, 2008, by and between USAePay, Inc. and United Payment Services, Inc.

Ring Central Service Plan (no formal written contract)

Pitney Bowes Lease Agreement, dated as of August 27, 2015, by and between Pitney Bowes and United Payment Services, Inc.

Frontier Communications (no formal written contract)

GoDaddy Internet services (no formal written contract)

Telecheck External Sales Agent Agreement by and between Telecheck Services, Inc. and United Payment Services, Inc.

ValuTec (no formal written agreement)

15

Gift Card Amendment to Marketing Agreement, by and between First Data Merchant Services Corporation, Wells Fargo Bank, N.A. and United Payment Services

Clover and Data Protection Amendment to Marketing Agreement, by and between First Data Merchant Services Corporation, Wells Fargo Bank, N.A. and United Payment Services

(xvii)

Referral source to be disclosed to Purchaser pursuant to Section 7.10 of the Agreement.

(xviii)

None.

(xix)

None.

(xx)

None.

(xxi)

None.

(xxii)

None.

16

**Schedule 4.11(c)**
**Material Contracts; Consents**

The FDMS Agreement.

17

**Schedule 4.12**
**Insurance Policies**

The BCBS Plan.
The Travelers Plan.
The Sequoia Plan.

18

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 88 of 104

**Schedule 4.13**
**Environmental Laws and Compliance**

None.

19

**Schedule 4.14(a)**
**Intellectual Property**

The Company owns all rights to the following web sites:

1. Sales Support Center (https://ssc.unitedpaymentservices.com).
2. MAO (https://mao.unitedpaymentservices.com).
3. Merchant Acquisition Acceptance System (https://maas.unitedpaymentservices.com).
4. The Company's public website (www.UnitedPaymentServices.com).

**Internet Domains**

| Domain | Vendor |
|---|---|
| Unitedpaymentservice.com | United Payment Services Go Daddy Reseller Account |
| Unitedpaymentservices.com | United Payment Services Go Daddy Reseller Account |
| Unitedpaymentservice.net | United Payment Services Go Daddy Reseller Account |
| Unitedpaymentservices.net | United Payment Services Go Daddy Reseller Account |

**Phone Numbers**

| Number | Notes | Vendor |
|---|---|---|
| 866-886-4833 | Main Sales Number | Ring Central |
| 888-464-0113 | Main Customer Service Number | Ring Central |
| 888-512-3712 | Toll Free for Ring Central admin | Ring Central |
| 805-557-8059 | Fax | Ring Central |
| 818-296-0519 | Sales User 1 | Ring Central |
| 888-512-3665 | Sales User 1 Toll Free | Ring Central |
| 805-960-5635 | Sales User 2 | Ring Central |
| 800-801-1955 | Sales User 2 Toll Free | Ring Central |
| 805-585-5129 | Customer Service User 1 | Ring Central |
| 805-960-5639 | Customer Service User 2 | Ring Central |
| 805-978-5795 | Customer Service User 3 | Ring Central |
| 805-994-0152 | Customer Service User 4 | Ring Central |
| 805-499-2098 | Analog Line | Frontier Communications |
| 805-499-2570 | Analog Line | Frontier Communications |

20

**Schedule 4.15**
**Transactions with Affiliates**

None.

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 91 of 104

**Schedule 4.17(a)**
**Employees**

1. Scott Rosen: President.
2. Craig Rosen: Chief Operating Officer.
3. Kari Gibson: Sales: Residuals of $16,000/month; paid 20% residuals and $70/deal.
4. Jennifer Leyva: Operations Manager; manages FDMS contract and business operations; $71,000/yr.
5. Melissa Mastracco: Technical Support Manager; Supports operations; $62,500/yr.
6. Monique Milin: Administrative and Customer Service; $40,000/yr.
7. Chad Parizek: Technical Support and Customer Service; $41,200/yr.

All employees are active status.

22

**Schedule 4.17(c)**
**Workers' Compensation Proceedings**

None.

**Schedule 4.17(e)**
**Employment Proceedings**

None.

**Schedule 4.17(h)**
**Company Benefit Plans**

Pursuant to that certain United Payment Services Employee Handbook (the "**Handbook**"), employees are entitled to receive benefits for health insurance payments of up to 50% of the deductible, capped at $200, as well as ten (10) days paid vacation per year.

25

**Schedule 4.17(n)**
**Benefit Plan Liabilities**

None.

Case 1:18-cv-02669-PKC   Document 1-2   Filed 03/26/18   Page 96 of 104

**Section 4.18(a)**
**Active Permits**

None.

**Schedule 4.18(b)**
**Non-Assignable Permits**

None.

28

**Schedule 4.18(c)**
**Permits Requiring Notice and/or Consent**

None.

**Schedule 4.19**
**Brokers, Finders and Investment Bankers**

None.

**Schedule 4.21**
**Compliance with Associations, Service Providers and Program Standards**

eProcessingNetwork notified of new PCI annual fee of $36.00/gateway billable in January, 2017.

31

**Schedule 4.25(c)**
**Uniform Merchant Contracts**

None.

**Schedule 4.25(d)**
**Merchant Accounts**

Referral source to be disclosed to Purchaser pursuant to Section 7.10 of the Agreement.

33

**Schedule 4.25(e)**
**Top 10 Sales Representatives/Referral Sources**

1. Kari Gibson
2. John Nauta
3. Additional referral source to be disclosed to Purchaser pursuant to Section 7.10 of the Agreement.

34

**Schedule 9.2(a)**
**Seller Consents and Approvals**

The FDMS Agreement.

35